In re William D. ALLEN, Sue
T. Allen, Debtors.

Bankruptcy No. 7–98–O1521–WSR–13.

United States Bankruptcy Court,
W.D. Virginia,
Roanoke Division.

Sept. 9, 1999.

---

## MEMORANDUM OPINION

WILLIAM F. STONE, Jr., Bankruptcy Judge.

This case is illustrative of the fact that a relatively routine Chapter 13 case in which the monetary difference in value between the two approaches of the parties is relatively small can present difficult and intriguing questions about the process of Chapter 13 plan confirmations, particularly with regard to the rights of undersecured creditors. The principal questions are:

1. What is the proper date for determining the value of the creditor's collateral?

2. Who bears the risk or suffers the consequences of delay in payment and/or depreciation in value of collateral when there is a significant delay between the date of original filing and the date of hearing on plan confirmation?

3. To what extent are the payments to be made to secured or partially secured creditors in reorganization cases who are proposed to be paid under the plan rather than directly from the debtor subject to the prior payment of administrative expenses of the estate, including fees to debtor's counsel?

While there are some factual disputes between the parties, their real battleground is the proper legal consequences which result from those facts. Pursuant to Bankruptcy Rule 7052 the Court makes the following findings of fact.

## FINDINGS OF FACT

This case has a fairly involved history and a chronological recitation of the relevant portions of that history seems the

best way to present the issues in the most understandable fashion.

1. On April 17, 1998 William and Sue Allen ("Debtors") filed a Chapter 13 petition and proposed plan in this Court. The petition represented that they owned four vehicles, a 1990 Cadillac, a 1995 Mercury Tracer, a 1994 Chevrolet Cavalier, and a Ford truck, the year and model of which were not stated. The Cadillac and the Mercury were indicated to be subject to liens in favor of KEMBA Roanoke Federal Credit Union ("KEMBA"), which is the objecting creditor in this case. The petition represented the value of the Mercury to be $7,800 against a loan balance of $8,832. The petition represented the value of the Cadillac to be $5,000 against a loan balance of $3,868. The petition claimed the difference between the stated value and the debt as a portion of the homestead exemption provided by Virginia law. For reasons which are unclear to the Court, the proposed plan indicated that the Cadillac would be valued for purposes of plan treatment as a CRAMDOWN having a value of $3,868 and to be paid over a period of 30 months beginning after the payment of all administrative expense at an interest rate of 9% at $144.46 per month. The proposed plan provided that the $7,800 value of the Mercury would also be treated as a CRAMDOWN to be paid over a period of 30 months, also beginning after payment of administrative expenses, with interest at 9% at $291.32 per month. The Debtors proposed to surrender the Chevrolet Cavalier but to retain all other vehicles. The Ford truck was indicated to have a value of $13,000 and subject to a lien securing a loan balance of $11,387. The difference was claimed as exempt. While the plan proposed that the debtors would pay directly according to their terms the first and second deeds of trust against their primary residence, the loan secured by the Ford truck and a loan secured by a mobile home which they owned, it provided that the Trustee would pay KEMBA on both the Cadillac and the Mercury loans. The petition also repre-sented that the debtors were liable on a third unsecured indebtedness owing to KEMBA in the amount of $18,524. Finally, as pertinent to this opinion, the proposed plan provided for 36 monthly payments of $550.00 each and a projected 2% payout to general unsecured creditors.

2. On May 26, 1998 KEMBA timely filed four proofs of claim, all asserted to be secured by the Cadillac and the Mercury, which were indicated to have a total value of $15,550. These claims were designated on the claims register as # 12, 13, 14 and 15 and were in the amounts of, respectively, $3,713.53, $9,174.85, $9192.59, and amount omitted. Claim # 15 was amended after the bar date to reflect an amount of $8,734.33. All amounts were as of the date of filing.

3. On June 3, 1998 KEMBA filed an Objection to Confirmation based on a number of stated grounds, some of which related to it solely and some of which were generally applicable, such as the continuation of Mr. Allen's contributions to a 401K plan with his employer and a monthly deduction from Mrs. Allen's paycheck to purchase stock in her employer.

4. A confirmation hearing was held on September 15, 1998 and confirmation was denied. On October 2, 1998 the Debtors filed an Amended Plan dated September 23, 1998. This plan proposed to surrender the Cadillac to KEMBA and a projected payout to general creditors of 21% based on continuation of the same $550.00 per month payment into the plan for 36 months.

5. On November 17, 1998 KEMBA filed a Motion for Relief from the automatic stay so that it could take possession of and liquidate the Cadillac as proposed in the Amended Plan. A hearing was scheduled on this motion for December 14, 1998.

6. On December 1, 1998 KEMBA filed an Objection to confirmation of the Amended Plan reiterating the same grounds stated in its Objection to the orig-

inal Plan. On December 4, 1998 the Trustee also filed an Objection to Confirmation. On December 14, the day scheduled for the hearing on the Motion for Relief, the debtors filed Amended Plan No. 2, which again proposed that the debtors would retain the Cadillac and that its asserted value of $3,713.53 (which was the exact amount of KEMBA's Claim No. 12) would be paid with interest at 9% in 24 monthly payments of $169.75 each beginning after payment of administrative expenses of the plan. On the same date the debtors filed objections to all 4 of KEMBA's claims on the ground that the cross-collateralization language of the loan documentation violated Regulation Z/ Truth–in–Lending. They further objected to claims # 14 and 15 on the ground that they were general unsecured claims which were not secured by either of the two vehicles upon which KEMBA held recorded liens. Apparently counsel for KEMBA either consented to continuance of any hearing on its pending Motion for Relief or at least failed to make any objection on the record to such continuance or make any demand for adequate protection payments during the continuation of the automatic stay. The docket does not reflect any action with regard to the Motion for Relief.

7. Although the Court makes no finding as to the motivation behind the challenge to the validity of the KEMBA documentation and does not desire to leave any implication as to any implied or implicit finding as to such motivation, the Court has concluded that the reversal of position between the Amended Plan and Amended Plan No. 2 as to surrender or retention of the Cadillac was attributable to a combination of Mrs. Allen's interest in keeping the vehicle and debtors' counsel's anger at what he considered the intransigence of KEMBA and his desire to respond in kind.

8. On January 7, 1999 KEMBA filed its Objection to confirmation of Amended Plan No. 2. On January 25, 1999 a hearing was held and counsel were directed to file a stipulation and briefs. Debtors' counsel

filed his brief of March 22 and a joint Stipulation of Facts was filed on March 31. Included in the Stipulations "with respect to the Debtors' objections to the claims of KEMBA" were that the NADA retail value of the Cadillac was $7,725 and that KEMBA's position was that it was secured to the extent of $7,800 as to Claim No. 15 and to the extent of $7,725 as to Claims Nos. 12, 13 and 14. KEMBA filed its reply brief on April 7 and the Debtors filed a reply brief on April 19. On July 8, 1999 this Court (Pearson, J.) ruled in favor of KEMBA in an unpublished Memorandum Opinion.

9. On July 25, 1999 Debtors filed their Amended Plan No. 3 dated June 25, 1999. This plan proposed that 22 additional monthly payments of $450 per month beginning September 1999 be made into the plan. It also again proposed that the Cadillac would be surrendered to KEMBA with a "credit of no less than $3,700 be applied to claims" and projected a 5% distribution to general creditors. It further provided with regard to KEMBA that the $7,800 value for the Mercury would be paid with interest at 9% in 26 monthly payments of $331.32 each to "commence after payment of administrative expenses, including estimated attorney fee balance of $2,500.00."

10. This Court held a hearing on August 23rd and received extensive oral arguments and representations by counsel, the testimony of Mr. Allen, and several documentary exhibits. Counsel have also provided to the Court at its request letters containing their respective positions and some of their arguments. At that hearing it became apparent, to the surprise of both counsel, that Mr. Allen is now receiving approximately $225 per month from Social Security which is not reflected in the Debtors' new Schedule I of household income and expenses or in the latest plan. On the other side, however, the new schedule and proposed plan reflect monthly pension income of $1,058 to Mr. Allen which appar-

ently will not commence until this next January.

11. Although Mr. Allen testified at the hearing about frequent problems with the Cadillac and the many repairs which he had made to it, he did not offer any opinion as to its value, either at the time the case was filed or as of the date in August 1999 which he had turned the vehicle over to KEMBA, which likewise failed to offer any evidence at the hearing on such question. Counsel for KEMBA represented that it is in the process of readying the car for sale and does not know what it likely will be able to obtain for it.

12. As of July 26, 1999 the Debtors had paid a total sum of $8,050 to the Trustee. No funds have been disbursed to date. The Trustee has not taken a position as to whether or not the latest proposed plan ought to be confirmed. Subsequent to the hearing Debtors' counsel filed an Application for Compensation to be paid by the Trustee as an administrative expense in the net amount of $5028.13 ($5,228.13 less $200 paid by the debtors prior to bankruptcy) and has noticed this request for a hearing on September 27, which is the date this case has been continued to for docket tracking purposes. The parties agreed that the Court would not address the subject of attorney's fees for Debtors' counsel at the August 23rd hearing or in this decision.

13. KEMBA's stated grounds for its Objection to Amended Plan No. 3 are as follows:

a. Most of the estimated $2,500 amount for debtors' attorney's fees was incurred in resisting KEMBA's claims and therefore resulted in no benefit to the estate and in any event should not be paid prior to payments on secured debts.

b. KEMBA should be paid upon plan confirmation a minimum of 15 monthly payments upon the allowed secured claim of $7,800 for the Mercury loan which should be applied to interest on the loan from the date of original plan filing to the date of confirmation with balance to principal and then it should continue receiving monthly payments until such remaining balance of principal is fully paid.

c. As to the Cadillac to be surrendered, KEMBA should receive at a minimum upon confirmation $2,546.25 representing 15 monthly payments of $169.75 each as adequate protection payments for depreciation in value of the vehicle during the period while the case has been pending. In addition the plan should not require a credit in the sum certain of $3,700 when the condition of the car is unknown and KEMBA doesn't know whether it can now be liquidated for a net recovery of at least that much.

d. A plan providing only a 5% payout to general creditors is not meaningful and should not be confirmed. KEMBA urges that requiring the debtors to pay into the plan the sum of $7,300 representing a combination of 401K plan contributions by Mr. Allen, stock purchased by Mrs. Allen by payroll deduction and an income tax refund would increase the payout to approximately 30%.

14. Counsel for the Debtors has presented extensive and impressive arguments supporting the commitment being proposed by his clients and the use of the funds which KEMBA seeks for the general creditors, but under the view the Court takes of the case, it would serve no worthwhile purpose to detail them or make findings regarding them.

## CONCLUSIONS OF LAW

■ The above recitation has been considerably longer than the Court would have preferred but has been considered necessary to provide a full understanding of the circumstances underpinning the Conclusions of Law which follow. The starting point in the Bankruptcy Code for answering the questions posed by this case is found in 11 U.S.C. § 1325, which states

with respect to secured or partially secured claims as follows:

(a) ...the court shall confirm a plan if—

(5) with respect to each allowed secured claim provided for by the plan—

(B)(i) the plan provides that the holder of such claim retain the lien securing such claim; and

(ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim; or

(C) the debtor surrenders the property securing such claim to such holder;

Considering that the Bankruptcy Code contains more than fifty definitions of terms which it uses, it seems remarkable that the Code doesn't contain a definition of the term "effective date of the plan," especially in view of its importance, but one will search in vain for it. As a result bankruptcy and appellate courts have struggled with what the "effective date" of a Chapter 13 plan ought to be and have reached varying results. An extensive collection of cases and an interesting article concerning the timing and methods of valuation in various kinds of bankruptcy proceedings can be found at 134 A.L.R. Fed. 439 (1996), Time and Method of Valuation Under 11 U.S.C. § 506, of Security Held by Creditor of Bankruptcy Estate, by Rosemary Williams, J.D. Because the drafters of the Code could easily have designated something quite specific such as the date of filing or the date of confirmation, it may be that the term was intended to be a phrase of art to be determined on a case-by-case basis depending upon each case's particular circumstances. In any event a careful review of the quoted wording of the statute reveals that there are really two valuation date issues:

1. On what date should the collateral securing the claim be valued?

2. On what date should the property (usually cash payments with interest over a period of time) to be distributed to the creditor be valued?

While the answer to both questions could be the same date, and many courts have either expressly or by implication reached that result, that is not necessarily the correct answer. *See In re Jones*, 219 B.R. 506 (Bankr.N.D.Ill.1998)(confirmation date for both). There is help to be found in other provisions of the Code in answering these questions. One of the critical terms is "allowed secured claim." 11 U.S.C. § 506(a) provides in relevant part as follows:

An allowed claim of a creditor secured by a lien on property in which the estate has an interest ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, ... and is an unsecured claim to the extent that the value of such creditor's interest ... is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

11 U.S.C. § 501(a) provides that a creditor may file a proof of claim. Section 502 deals with "allowance" of a claim and subsection (b) provides that the amount of a claim is to be determined "as of the date of the filing of the petition." Under Bankruptcy Rule 3002(c) for most non-governmental claimants a proof of claim must be filed within 90 days after the first date set for the meeting of creditors. The official proof of claim form, in accordance with the wording of the statute, requires the creditor to state the "total amount" of its claim "at time case filed". It also requires the creditor to state if its claim is secured by collateral and, if so, the value of the collateral. The logical, although admittedly not inescapable, conclusion is that the value of the collateral is also to be valued as of the date of filing, a conclusion reinforced by

the practical aspects of the proof of claim being due relatively soon after the commencement of the case. *See United Carolina Bank v. Hall*, 993 F.2d 1126, 1131 (4th Cir.1993) Chapter 13 plan payments to undersecured creditor "must be not less than the value of the securing property at the time the petition is filed." *In Re Rodnok*, 197 B.R. 232 (Bankr.E.D.Va.1996)(value of vehicle in Chapter 13 case valued at filing date). *Accord, In re Dews*, 191 B.R. 86 (Bankr. E.D.Va.1995). Valuing the collateral as of the filing date seems most appropriate because the filing date is the one which alters the rights otherwise possessed by the secured creditor under its documentation and state law to repossess the collateral, liquidate it and apply the sale proceeds to the debt. It also establishes consistency between valuation of wholly unsecured claims, which of course are established as of the filing date, and the unsecured portion of partially secured claims. Use of the filing date for collateral valuation also protects the creditor in the situation presented in this case where the creditor is secured by depreciating property and there is a significant delay after the filing date before the confirmation hearing or there is some casualty to the property before such hearing. The amount of an "allowed secured claim" ought not ordinarily to vary depending on the date when a hearing on confirmation of a proposed plan is held, this case being a particularly appropriate illustration of that assertion where the hearing held on August 23rd was upon Amended Plan No. 3 and took place more than sixteen months after the filing date. In most cases there will be little difference between the two valuations when the confirmation hearing occurs relatively soon after the filing date. Although there may some practical problem in proving date of filing valuation where there is a significant delay or damage to the property before the confirmation hearing occurs, the same problem is faced by a creditor seeking adequate protection payments or administrative expense treatment for an alleged deterioration in value while the creditor has been prevented from taking possession of its collateral. Such a rule will encourage creditors to seek a prompt inspection and valuation of their collateral.

The valuation of the property to be distributed to the creditor presents a significantly different issue, however. The phrase "as of the effective date of the plan" comes immediately after the word "value" and immediately before the words "of property to be distributed under the plan on account of such claim." No similar wording is used with respect to the amount of the "allowed secured claim." If the partially secured creditor is to be paid by the Trustee, it will not start receiving distributions (except possibly for adequate protection payments) until the plan is confirmed. The key factors in determining the present value of what that creditor is to receive from the Trustee after confirmation are the amount, if any, to be distributed immediately upon confirmation, the amount and timing of any payments to be made over a period of time, and the applicable interest rate necessary to establish the appropriate present value of those payments. Market interest rates can move quickly. It would be questionable to use an interest rate which would have been appropriate at the filing date but has since materially changed to determine the present value of payments which are being fixed at the time of a confirmation hearing and cannot begin until the plan has been confirmed. Otherwise, the present value of the payments to be made to the secured or partially secured creditor following plan confirmation would be more or less than, depending upon the direction of the interest rate move, the amount of its allowed secured claim. Accordingly, the Court holds that the "effective date of the plan" is applicable not to the valuation of the collateral but rather the valuation of the property to be distributed to the secured creditor in payment of its "allowed secured claim" and that this date will ordinarily be the date of final hearing on plan confirma-

tion because that is the date on which the most currently valid information will be available to the parties and the Court to determine the present value of the payment, payments and/or stream of payments to be made by the Debtor or the Trustee to the creditor in satisfaction of its interest. *See Rake v. Wade,* 508 U.S. 464, 113 S.Ct. 2187, 124 L.Ed.2d 424 (1993)(" § 1325(a)(5)(B)(ii) guarantees that property distributed under a plan on account of a claim, including deferred cash payments in satisfaction of the claim (citation omitted) must equal the present dollar value of such claim as of the confirmation date." 508 U.S. at 469, 113 S.Ct. 2187)

■ Although the debtors have alternated in the total of four plans which they have filed to date in this case between keeping and surrendering the Cadillac, they have now surrendered it to KEMBA, which is in the process of selling it. The NADA standard of retail value is not relevant to its valuation for the purpose of the plan now before the Court. The correct standard for this purpose is the net fair liquidation value of such vehicle as of the date of filing. To the extent that this value exceeds the net fair liquidation value of this vehicle when it was actually surrendered to KEMBA, such creditor, upon application, proper notice and satisfactory evidence or upon confirmation of a plan providing to such effect, will be entitled to an award of an administrative expense against the estate for the difference. *See Grundy Nat. Bank v. Rife,* 876 F.2d 361, 363–364 (4th Cir.1989).

■ The next question, and a most challenging one it is, before the Court is KEMBA's demand for interest for the period between the date of filing and the date it begins to receive payments under any plan ultimately confirmed by the Court. This is completely separate from the question of deterioration of value of the collateral. An unsecured creditor is not entitled to claim any post-filing interest. 11 U.S.C. § 502(b). A secured creditor may continue to receive interest after filing if its collateral is worth

more than the amount owed to it on the filing date.

To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.

11 U.S.C. § 502(b). Clearly, then, an undersecured creditor is not entitled to any post-filing pre-confirmation interest upon the full amount of the debt. In the case of *Rake v. Wade,* 508 U.S. 464, 113 S.Ct. 2187, 124 L.Ed.2d 424 (1993), which was a Chapter 13 bankruptcy case, the parties agreed and the Supreme Court endorsed the principle that section 506(b) applies to that period between the date of filing and the date of confirmation. 508 U.S. at 468, 113 S.Ct. 2187. What about, however, interest upon the amount representing the value of the security? The language quoted above would appear to deny such interest because the value of the collateral is not more than the amount of the "allowed secured claim." In its opinion in the case of *United Savings v. Timbers of Inwood Forest,* 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988), the Supreme Court held that in a Chapter 11 case a partially secured creditor was not entitled to post-filing pre-confirmation interest upon the value of its security. *Accord, Matter of Arvelo,* 176 B.R. 349 (Bankr.N.J.1995); 4 Collier on Bankruptcy § 506.04[2] at page 506–109 (15th Edition Revised 1999). That answer becomes somewhat troubling, however, the longer the delay between the date of filing and the date of plan confirmation. Does the debtor or the estate, as the case may be, get a free ride at the creditor's expense during this period? This is not simply an interesting exercise in statutory construction, but rather an issue of real economic cost or loss and upon whom that cost should fall when the

debtor elects to retain the property upon which the creditor has a lien. The facts of this very case can be used to put the issue concretely when no plan has been confirmed more than 16 months after the filing date.

In this case the Debtors elected to keep the Ford truck, said to have a value of $13,000 securing a loan balance of $11,387, in matters of this kind clearly a rather thin margin. The Debtors have proposed in each of their plans to make the payments for this truck upon the terms of the original contract directly to the creditor. Assuming that they have made those payments, the creditor has never ceased receiving interest upon the debt. Suppose, however, that this truck was not worth quite what the Debtors believed when they filed but was worth only the loan balance. In such a situation the Debtors could have chosen any of three options in their proposed plan:

1. To keep the truck and make the payments directly to the creditor, in which case the creditor would continue to receive its interest in full and when due.

2. To keep the truck but propose a new payment arrangement to the creditor under which it will be paid from the estate, in which case, unless KEMBA is correct, the creditor would be deprived of interest accruing on the secured portion of the debt from the filing date to the confirmation date.

3. To surrender the truck to the creditor, in which case the creditor could sell the truck upon plan confirmation, or sooner if it filed a motion for relief from the stay and received that relief before plan confirmation, in which case the creditor after some delay would be able to obtain the benefit of its contractual rights against the collateral.

Of course the creditor under the first option is happy, but in the bankruptcy context is it receiving more that it is entitled to, or is the creditor under the second option receiving less? Similarly, if the creditor in the second option situation immediately after the commencement of the case seeks adequate protection payments, is it entitled to payments representing interest on the secured portion of the debt without any showing that the property is losing or is likely to lose value prior to plan confirmation? Under the ruling in *United Savings v. Timbers of Inwood Forest, supra,* it is not. Under the surrender option the creditor ordinarily can only look to the value it can derive from sale of the truck and therefore it suffers the loss of interest upon the entire debt until it is able to gain possession of the vehicle and the right to be able to liquidate it. Accordingly, in that situation the debtor or the estate gets the benefit of the post-confirmation use of the truck unless the creditor can apply for allowance as an administrative expense under section 503(b) of the Code for the value of the post-filing use of the truck until the time of surrender.

To add an additional layer of complexity to this discussion, 11 U.S.C. § 1326 provides that, unless the Court orders otherwise, the debtor shall commence making payments into the plan within 30 days after the plan is filed, and that if the plan is confirmed, the trustee "shall distribute any such payment in accordance with the plan as soon as practicable." The plan proposed in this case is for 36 months. If the Debtors have made 15 payments, for example, into the plan by the date of confirmation, there will only be 21 months of payments left to be made. Accordingly, the Trustee would not be making 26 monthly payments upon the Mercury loan for a period of 26 months following plan confirmation, as provided for in the plan, but will make, presumably, one substantial payment promptly following confirmation followed by 21 monthly payments. If the payment made to the creditor following confirmation and which has been funded with pre-confirmation payments is applied entirely to principal, the Debtors, or the general creditors, as the case may be, have clearly gained a windfall due simply to the

delay in the confirmation process resulting from the Debtors' own failure to propose a confirmable plan free of valid objection from creditors. If the confirmation process could be strung out long enough, the partially secured creditor's right to the present value of its allowed secured claim could be largely nullified.

In *United Savings v. Timbers of Inwood Forest, supra,* the Supreme Court confronted the contention that undersecured creditors will face inordinate and extortionate delay if they are denied compensation by interest lost during the stay as part of "adequate protection" under § 362(d)(1). 484 U.S. at 375, 108 S.Ct. 626. It gave the following answer:

> Once the movant under § 362(d)(2) establishes that he is an undersecured creditor, it is the burden of the *debtor* to establish that the collateral at issue is "necessary to an effective reorganization." *See* section 362(g). What this requires is not merely a showing that if there is conceivably to be an effective reorganization, this property will be needed for it; but that the property is essential for an effective reorganization *that is in prospect.* This means ... that there must be "a reasonable possibility of a reorganization within a reasonable time." .... The cases are numerous in which § 362(d)(2) relief has been provided within less than a year from the filing of the bankruptcy petition. (footnote omitted) And while the bankruptcy courts demand less detailed showings during the first four months in which the debtor is given the exclusive right to put together a plan, *see* 11 U.S.C. §§ 1121(b), (c)(2), even within that period lack of any realistic prospect of effective reorganization will require § 362(d)(2) relief. (footnote omitted)

484 U.S. at 375–76, 108 S.Ct. 626. In the case before the Court, KEMBA sought to obtain relief from the stay on the ground that the Debtors desired to surrender the Cadillac as proposed in their Amended Plan, not on the ground that the Debtors had no equity in the vehicle and that it was not necessary for an effective reorganization. No Motion for Relief at all was filed as to the Mercury. Should that make a difference in the outcome of this case? As a matter of policy, at least, it seems better to encourage an open-minded and cooperative approach by partially secured creditors rather than putting a premium upon the most aggressive and prompt resort to motions seeking the repossession and sale of the creditors' collateral. As the Court further stated in *Timbers, supra,:*

> [I]t is incomprehensible why Congress would want to favor undersecured creditors with interest if they move for it under § 362(d)(61) at the inception of the reorganization process—thereby probably pushing the estate into liquidation—but not if they forbear and seek it only at the completion of the reorganization.

484 U.S. at 374, 108 S.Ct. 626. *See also* 3 Collier on Bankruptcy § 363.05[1] at pages 363–38 through –39 (15th Edition Rev. 1999).

■ Is there any way to draw from this discussion some coherent rule or set of rules which appropriately gives effect to the specific provisions of the Bankruptcy Code and fosters its overall purposes? Not easily, it appears, but the Court obtains some guidance from its belief that it is the general intent of the Bankruptcy Code that secured or partially secured creditors obtain in bankruptcy approximately the same basic economic equivalency of treatment or compensation for the value of their "allowed secured claims" irrespective of the chapter under which their debtors may seek relief. The Court believes that the best way to fulfill that general intent in a Chapter 13 case is to rule as follows:

> 1. An undersecured creditor is not entitled to any interest upon its allowed secured claim between the date of filing and the date first set for the confirmation hearing on the plan originally filed by the debtor.

2. Thereafter the creditor will be entitled to interest upon the amount of its allowed secured claim until the effective date of the plan, ordinarily the date of the final hearing upon plan confirmation, or the date the collateral is surrendered to the creditor, whichever comes first.

In this way the undersecured creditor suffers the loss of all interest upon its secured claim for the routine period of time for the Bankruptcy Court to operate without having to absorb an open-ended loss resulting from extended delay in obtaining a plan confirmed by the Court. Once a plan has been confirmed by the Court, the value of payments to be made to that creditor under the terms of that plan will include appropriate interest (subject to a special rule for curing a default under 11 U.S.C. § 1322(e)) so that their present value will equal the amount of the creditor's "allowed secured claim." Another way of stating this ruling is that the "effective date" of the plan for the purpose of determining the undersecured creditor's entitlement will be the date of the first scheduled confirmation hearing, which generally is the date the plan would have been confirmed had the debtor originally proposed a plan free of valid objection. Because the proponent of a Chapter 13 plan, i.e., the debtor, bears the burden of proof as to its confirmation, *Tillman v. Lombard,* 156 B.R. 156 (E.D.Va.1993), and therefore has the obligation to propose a plan which can be confirmed by the Court under the requirements of the Bankruptcy Code, it is appropriate to place the economic burden of the effects vis-a-vis partially secured creditors of delayed confirmation upon such debtor rather than upon the holders of "allowed secured claims." There should be an incentive rather than a disincentive to the debtor to propose and obtain confirmation of a proper plan as expeditiously as reasonably possible. With specific reference to the Mercury loan in this case, this rule would mean that a confirmed plan would place the debtors, the creditor and the estate in the same position as if the final confirmed plan had been confirmed upon the date first set for a confirmation hearing on the original plan. KEMBA would receive promptly after confirmation those monthly payments applicable to its loan which had been made by the debtors to that date. It would have no claim arising from the fact that its receipt of those payments has been delayed by the prolonged confirmation process, but neither would it have to forfeit the normal interest components of those payments, which it unquestionably would have been entitled to if the plan had been confirmed in the ideal confirmation timeframe. As to this particular ground of KEMBA'S Objection to Confirmation, therefore, the same is overruled.

There are two other factors which bear noting in attempting to bring harmony between the opinion in *Timbers, supra,* and the ruling in this case. First, *Timbers,* as previously noted, was a Chapter 11 case. In a proceeding under Chapter 11 there is no requirement that the debtor file a plan of reorganization with or promptly after the filing of its petition. Although the debtor has the exclusive right during the first 120 days to submit a plan, it is not required to do so. 11 U.S.C. § 1121. Thereafter, unless the creditor has obtained from the Court an extension of the exclusivity period, any party in interest can propose a plan. Conversely, a debtor must file his proposed Chapter 13 with his petition or within 15 days thereafter unless the Court grants an extension for cause, Bankruptcy Rule 3015(b). Furthermore, only the debtor can propose a Chapter 13 plan. It is clear that Chapter 13 contemplates a prompt procedure. Second, in *Timbers* the creditor's collateral was an apartment project upon which it had an assignment of rents. The debtor agreed for the creditor to receive post-petition rents less operating expenses. Not being satisfied with that, the creditor sought interest at the market rate on the value of the property. In short, some might say that the creditor got a little greedy. In this case, as would no doubt be true in

most Chapter 13 cases, the Debtors derive no income directly from the property but enjoy its use. In short, the partially secured creditor in *Timbers* was in effect already receiving the use value of the collateral while the same is not ordinarily true for undersecured creditors in a Chapter 13 case. These differences bolster in the Court's mind the belief that the ruling in this Chapter 13 case appropriately balances the competing interests of debtors, their unsecured general creditors, and their partially secured creditors.

■ The Court agrees with KEMBA that the procedure of paying administrative expenses of the case from the estate to the extent of available funds prior to payment of amounts due secured creditors is not in compliance with the requirements of section 1325(a)(5)(B)(ii) of the Code. While the Court recognizes that this procedure may be routine, nevertheless it does not provide to secured creditors that to which they are entitled. First, providing a payment schedule to a creditor of 36 monthly payments of some designated amount including interest at 9%, for example, assumes that the first payment will be made one month from the commencement date and that successive payments will follow monthly thereafter. If the first payment is delayed for six months, for example, it does not have the same value to the creditor and does not result in the creditor receiving the present value of its "allowed secured claim". It would be like obtaining a mortgage and asking the lender if it would be satisfactory to skip the first six months of payments with the understanding that they will be caught up by the final maturity of the loan. Even the most conciliatory of rational lenders will not agree to this without imposing a charge for this indulgence. Second and equally important, it is inconsistent with the priorities of payment established in section 507 of the Code. The priorities established by that section are with respect to unsecured claims against the estate. *See United Savings v. Timbers of Inwood Forest, supra,*

484 U.S. at 378, 108 S.Ct. 626. Subsection (b) of that section expressly provides that a secured creditor which has a claim against the estate for adequate protection payments allowed to it has priority for such payments over all other administrative expenses in the case. Therefore, payments due under the confirmed plan with respect to "allowed secured claims" have priority over the administrative expenses, not vice-versa.

■ In this case the debtors originally attempted to eliminate, for all practical purposes, their unsecured debt (proposed 2% payout to unsecured creditors) and keep all of their property which they apparently had any interest in keeping without undergoing a Chapter 7 proceeding or materially altering their lifestyle or standard of living. The Court doesn't believe that Chapter 13 was intended to accommodate this type of effort. While Amended Plan No. 3 now before the Court, especially considering the changed circumstances of the parties, is a much more serious proposal, it still is not indicative of a real willingness to make the changes and commitments necessary to provide a meaningful repayment plan to general creditors. A proposed 5% payout to those creditors may not do much more, if any at all, for them than covering the administrative expense of monitoring, receiving, and crediting such payments as may be received from the Trustee.

■ Finally, Amended Plan No. 3 before the Court cannot be confirmed because it fails to consider the Social Security income now being received by Mr. Allen, although the Trustee may conclude after reviewing the matter that the fact of such income is offset by the delayed commencement of the employer pension to which Mr. Allen is entitled.

For the reasons stated above the Objection filed by KEMBA to confirmation of Debtors' proposed Amended Plan No. 3 is sustained (although not upon all of the grounds claimed) and confirmation of such

plan is denied. An order to such effect will be entered contemporaneously.

The Clerk is directed to send copies of this Memorandum Opinion to the Debtors, to their counsel, to counsel for KEMBA, to the Trustee, and to the Office of the United States Trustee.