**In re Robert W. SCOTT, Debtor.**

**Bankruptcy No. 99 B 33197.**

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

May 24, 2000.

---

Peter Francis Geraci, Chicago, IL, for Debtor.

Kenneth B. Drost, P.C., Barrington, IL, for Summit Acceptance Corp.

## MEMORANDUM OF OPINION

EUGENE R. WEDOFF, Bankruptcy Judge.

This Chapter 13 case is before the court on a creditor's objection to confirmation, raising the recurring question of the rate of interest that must be paid on a secured claim being "crammed down" pursuant to § 1325(a)(5)(B)(ii) of the Bankruptcy Code (Title 11, U.S.C.). As discussed below, secured automobile loans crammed down in a Chapter 13 case ordinarily do not require interest payments at greater than the prime rate in effect on the date of confirmation of the debtor's plan. Since the debtor's plan provides for payment of the creditor's claim at this rate, the objection has been overruled.

## Jurisdiction

Federal district courts have exclusive jurisdiction over bankruptcy cases. 28 U.S.C. § 1334(a). However, pursuant to 28 U.S.C. § 157(a), district courts may refer bankruptcy cases to the bankruptcy judges for their district, and, by Internal Operating Procedure 15(a), the District Court for the Northern District of Illinois has made such a reference of the pending case. When presiding over a referred case, a bankruptcy judge has jurisdiction, under 28 U.S.C. § 157(b)(1), to enter appropriate orders and judgments as to core proceedings within the case. Confirmation of a plan is a core proceeding under 28 U.S.C. § 157(b)(2)(L), and so this court may enter a final order resolving the present objection to confirmation.

## Findings of Fact

The debtor in this case, Robert W. Scott, lives with his wife and two children in an apartment in a Chicago suburb, and works in another suburb, some 20 miles away from his home. The family owns two automobiles purchased on credit, a 1995 Pontiac that has been driven 100,000 miles, and a 1996 Plymouth, driven 85,000 miles. Scott earns about $54,000 annually, but after deductions for taxes and child support, his monthly take-home pay is only $1,841. By keeping household expenses to a minimum (including $275 per month for food), Scott can project a monthly budget with $400 available to pay debts.

Scott fell behind in his car payments, and, in September 1999, he filed a petition for relief under Chapter 13 of the Bankruptcy Code. Scott's only secured debts were was the car loans, owed to Summit Acceptance Corporation ("Summit"), for the Plymouth, and to another creditor for the Pontiac. Scott's other, unsecured debts totalled $2,472. To deal with all of the claims against him, Scott submitted a Chapter 13 plan which, as amended, proposed:

(1) that Scott would keep both automobiles;

(2) that Scott would make monthly payments of $400 to the Chapter 13 trustee for at least 36 months, and for such longer period, up to 60 months, as would be required to pay unsecured claims at the rate of 40% (the plan estimated that 54 months would be required for this purpose);

(3) that from these monthly payments, the secured creditors would be paid by the Chapter 13 trustee "100% of the current value of [the automobiles] plus interest at a rate of 9% per annum," with Summit being paid in installments of $200 per month and the other creditor in monthly installments of $172;

(4) that the automobiles would be valued at "the retail value shown on the N.A.D.A. Official Used Car Guide as of the effective date of the plan"; and

(5) that the balance of the secured claims, in excess of the automobiles' value, would be paid as unsecured claims.

On November 2, 1999, Summit filed a proof of claim in the amount of $15,880, asserting that this entire amount was secured, and on January 3, 2000, Summit filed an objection to confirmation of Scott's Chapter 13 plan, arguing principally that the proposed plan payments were insufficient to pay Summit the full amount of its secured claim with appropriate interest. On January 7, Scott responded by objecting to Summit's claim, contending (1) that the automobile (and hence Summit's secured claim) should be valued at $9,075, and (2) that with interest at 9%, plan payments would be sufficient to satisfy the claim. Finally, on January 18, Summit replied to the claim objection, citing authority for the proposition that it was entitled to its contract rate of interest, 24% per annum, based on the value of the automobile as of the date of filing, which it contended was $9,275. The parties have since resolved their dispute regarding the valuation of Summit's secured claim, by agreeing to Scott's valuation.

On April 24, 2000, this court entered an order confirming the debtor's plan over the creditor's objection. This opinion sets forth the reasons for that ruling.

## Conclusions of Law

■ The dispute between the parties here is the proper cramdown interest rate. If the 24% rate demanded by Summit is required for cramdown of its secured claim, then confirmation would have to be denied, not only because the plan calls for a lower interest rate, but because no plan could feasibly pay 24% interest on Summit's claim.[1] However, if the 9% rate proposed by the debtor's plan is appropriate then the plan is feasible and may be confirmed.[2] To resolve this dispute, it is helpful to consider the way in which cramdown generally operates in bankruptcy.

*Cramdown generally.* Like Chapters 11 and 12, Chapter 13 of the Bankruptcy Code, in § 1322(b)(2), provides that a plan may modify secured claims.[3] However, pursuant to § 1325(a)(5)(B), unless the secured creditor agrees to some different "modification," the debtor has only two options for dealing with the claim: either surrender the collateral to the secured creditor, or keep the collateral and make the minimum payment required for "cramdown."[4]

---

1. Even if the plan were extended to the five-year maximum allowed by § 1322(d) of the Code, satisfying an obligation of $9,075 at 24% interest would require monthly payments of $261, well in excess of the amount available for Summit's claim under Scott's budget.

2. With the 9% interest rate, payments of $200 per month, as specified in Scott's amended plan, would pay Summit's $9,075 secured claim in 56 months.

3. In Chapter 11, § 1123(a)(5)(E) allows a plan to provide for the "modification of any lien," and § 1222(b)(2) allows Chapter 12 plans to "modify the rights of holders of secured claims."

4. Courts often refer to the operation of §§ 1322(b)(2) and 1325(a)(5)(B) as "cram down," possibly because this treatment of secured claims can be "crammed down the throat" of creditors who voice objections to the plan. This etymology is suggested by *In re Schaitz,* 913 F.2d 452, 453 (7th Cir.1990):

The calculation of the minimum cramdown payment is often critically important in Chapter 13. As the present case demonstrates, whether or not a debtor is able to propose a confirmable Chapter 13 plan may depend on the amount of the required cramdown payments. Moreover, unless the debtor has sufficient disposable income to pay all claims in full during a Chapter 13 case, the rules for cramdown determine how the debtor's plan payments are divided between secured and unsecured creditors—the higher the cramdown payments, the lower the payments to unsecured creditors.

The minimum payment for cramdown of a secured claim, pursuant to § 1325(a)(5)(B)(ii), is "the allowed amount of such claim," measured "as of the effective date of the plan." In practice, this requirement means that a plan must provide for periodic installment payments of (1) the allowed amount of the secured claim and (2) sufficient interest to provide value "as of the effective date" of the plan. *Bellamy v. Federal Home Loan Mortgage Corp. (In re Bellamy)*, 962 F.2d 176, 185–86 (2d Cir.1992). The total amount that a secured creditor is entitled to receive in the cramdown of its claim is therefore the product of two variables: the "allowed amount" of the secured claim and the required interest rate. Both variables have often been the subject of dispute.

The first variable—value of an allowed secured claim—is determined by bifurcation under § 506(a) of the Code. *Associates Commercial Corp. v. Rash (In re Rash)*, 90 F.3d 1036, 1041 (5th Cir.1996) (en banc), *rev'd on other grounds*, 520 U.S. 953, 117 S.Ct. 1879, 138 L.Ed.2d 148 (1997). Section 506(a) limits a creditor's "allowed secured claim" to the value of the collateral supporting the claim, and provides the creditor with an unsecured claim to the extent of any deficiency in collateral value.

Thus, a claim of $10,000, secured by an automobile worth $7,000, would be bifurcated into a "stripped down" allowed secured claim of $7,000 and an unsecured claim of $3,000. However, there was considerable controversy about how to value collateral for this purpose, which ultimately led to the Supreme Court's decision in *Associates Commercial Corp. v. Rash*, 520 U.S. 953, 117 S.Ct. 1879, 138 L.Ed.2d 148 (1997). There, the Court rejected arguments that collateral should be valued according to what the creditor would receive upon repossession, and instead held that, in the context of cramdown, § 506(a) requires the use of "replacement value," so that, for purposes of determining the amount of an allowed secured claim, collateral must be valued at "the cost the debtor would incur to obtain a like asset for the same 'proposed ... use.'" 520 U.S. at 965, 117 S.Ct. at 1886.

The second variable—the interest rate required to provide present value—is not only at issue in the present case, but has also been the subject of numerous prior opinions, being "arguably the most debated economic issue in bankruptcy litigation." Monica Hartman, *Selecting the Correct Cramdown Interest Rate in Chapter 11 and Chapter 13 Bankruptcies*, 47 UCLA L.Rev. 521, 522 (1999).

*Determining the proper cramdown interest rate.* One scholar has remarked that "there are reported bankruptcy court opinions to support almost any conceivable cram down interest rate." David G. Epstein, *Don't Go and Do Something Rash About Cram Down Interest Rates*, 49 Ala. L.Rev. 435, 443 (1998). Nevertheless, the opinions do share common features:

● Nearly all of the decisions are premised on the principle that the cramdown interest rate should provide secured credi-

"Instead of the trustee's seizing and selling the bankrupt's non-exempt assets, as in a Chapter 7 proceeding, under Chapter 13 ... the bankrupt proposes a plan for the repayment of his debts out of future income.

Sometimes the plan is in the creditors' best interests, but even if they object to it the bankruptcy judge can cram it down their throats. 11 U.S.C. § 1325(a)(5)(B)."

tors with the economic equivalent of repossessing their collateral—after all, surrender of the collateral is an alternative way of satisfying secured claims. *See, e.g., United Carolina Bank v. Hall,* 993 F.2d 1126, 1130 (4th Cir.1993) ("[T]he purpose of including interest as part of the installment payments is to place the secured creditor in the same economic position as if the debtor had surrendered the collateral to the secured creditor . . . .").

● Moreover, nearly all of the decisions have concluded that an interest rate reflecting variable market conditions should be used, as opposed to a fixed rate established by statute or rule. *See In re Hardzog,* 901 F.2d 858, 859 (10th Cir.1990), quoting 5 *Collier on Bankruptcy* § 1225.03 at 1225–21 (1989) ("[T]he cases considering the issue are fairly uniform in agreeing that a market rate of interest is appropriate . . . .").

● Finally, most of the decisions dealing with the proper "market rate" for cramdown can be placed into three general approaches.

*(1) Cost of funds.* Several courts have agreed with debtors that present value under § 1325(a)(5)(B) is provided to a secured creditor by an interest rate equivalent to what the creditor would have to pay to borrow money—the "cost of funds" approach. The theory here is cramdown prevents a creditor from immediately receiving the cash that would result from taking possession of its collateral, but that the creditor could obtain this cash simply by borrowing the collateral value from its own lenders. Thus, the theory proposes, ·the creditor will receive the economic equivalent of taking possession of its collateral if the cramdown interest rate is set at the rate the creditor would pay to borrow on its own account. See, for example, *In re Hudock,* 124 B.R. 532, 534 (Bankr. N.D.Ill.1991), which found that the cramdown interest on a Chapter 13 automobile loan should be at the prime rate, since this best approximates "the rate at which [the secured creditor] borrows the money it

then uses to make loans to consumers." *Accord In re Jordan,* 130 B.R. 185, 190 (Bankr.D.N.J.1991). More recently, the Second Circuit accepted the rationale of the cost of funds approach in *In re Valenti,* 105 F.3d 55, 63–64 (2nd Cir.1997), but declined to approve its application, primarily because of difficulties in administration.

*(2) New ("forced") loan to the debtor.* An opposing point of view (adopted by the majority of circuit court opinions) emphasizes that creditors may not be able to borrow the funds lost to them through the inability to obtain their collateral; this approach therefore requires that secured creditors be paid the interest rate that they would have obtained had they made new loans in the amount of the value of the collateral retained by the debtor. This "forced loan" approach was applied in *United Carolina Bank v. Hall,* 993 F.2d at 1130:

> When it is recognized that every secured creditor has a limited amount of credit on which to draw, then it follows that utilizing some of that borrowing capacity without providing the secured creditor with the usual return on its capital produces a loss for the secured creditor . . . .
>
> Therefore we conclude that it is fairer to treat the value of the collateral retained by the debtor under the "cram down" provision of Chapter 13 as a new loan and to match its rate of return to the secured creditor with that which the creditor would otherwise be able to obtain in its lending market.

The court in *Hall* placed two caveats on its approach: (1) that the relevant rate of return was what the secured creditor received, which might be less than what a borrower would pay (for example, if the creditor had to pay a fee to a third party for processing or administering the loan), and (2) that the interest rate should never exceed the contract rate, because this would cause an inequitable "windfall." 993 F.2d at 1131. The "forced-loan" approach was also employed in *General Motors Acceptance Corp. v. Jones,* 999 F.2d 63, 67–70

(3d Cir.1993); *In re Hardzog,* 901 F.2d 858, 860 (10th Cir.1990) (dealing with cramdown in the context of Chapter 12); and *In re Smithwick,* 121 F.3d 211, 213–14 (5th Cir.1997), *cert. denied sub nom. Smithwick v. Green Tree Financial Servicing Corp.,* 523 U.S. 1074, 118 S.Ct. 1516, 140 L.Ed.2d 669 (1998). *Jones,* 999 F.2d at 70–71, and *Smithwick,* 121 F.3d at 215, both hold that the interest rate specified in the contract between the debtor and creditor is presumptively the proper cramdown rate, since it would generally reflect the rate at which the creditor would make a new loan to the debtor, but *Jones* noted its view (contrary to *Hall)* that the appropriate rate might be shown to be higher than the contract rate. 999 F.2d at 71 n. 11.

*(3) "Risk plus" formula.* Still a third approach calculates the appropriate interest rate for cram down by adding a "risk factor" interest premium to some standard measure of "risk-free" lending. The Second Circuit, in *In re Valenti,* set cramdown interest at the rate paid on "a United States Treasury instrument with a maturity equivalent to the repayment schedule under the debtor's reorganization plan." 105 F.3d at 64. The court gave the following rationale: "This method of calculating interest is preferable to either the 'cost of funds' approach or the 'forced loan' approach because it is easy to apply, it is objective, and it will lead to uniform results. In addition, the treasury rate is responsive to market conditions." *Id.* However, noting that the treasury rate was "virtually risk-free," the court held that the cramdown rate "should also include a premium to reflect the risk to the creditor in receiving deferred payments under the reorganization plan," and cited authority for the risk premium of between one and three percent. *Accord In re Carson,* 227 B.R. 719 (Bankr.S.D.Ind.1998) (applying the prime rate plus 1–1/2%).

*Cramdown interest in the Seventh Circuit.* The Seventh Circuit addressed the question of the appropriate cramdown interest rate in the context of a Chapter 12 case, *Koopmans v. Farm Credit Serv. of Mid–America, ACA,* 102 F.3d 874 (7th Cir. 1996). To the extent that it applies to legal issues in the present case, this court must follow the *Koopmans* decision. However, the application of *Koopmans* to the present case is not straightforward.

In *Koopmans,* the secured creditor's collateral (the debtor's farm) was worth substantially more than the amount of its outstanding indebtedness, and thus the secured claim was not subject to any stripdown to the value of the collateral under § 506(a). Moreover, the contract rate of interest (8.75%) on the farm loan was less than what the bankruptcy court found would be charged for similar loans at the time of the confirmation hearing. The bankruptcy court determined that farm loans with adequate equity in the collateral would generally be extended at the prime rate, then 9%, and the debtor, given his history of default, would be charged a higher rate, which the court assessed at 10.5%. The Seventh Circuit affirmed this determination of the cramdown interest rate. This result appears consistent with the "risk-plus" approach of *Valenti.* In reality, however, the Seventh Circuit's rationale is that of the "forced loan" decisions; *Koopmans* cites *Jones* for the proposition that the cramdown interest rate may be greater than the contract rate, and states its holding as follows: "[T]he creditor is entitled to the rate of interest it could have obtained had it foreclosed and reinvested the proceeds in loans of equivalent duration and risk." 102 F.3d at 875. Elsewhere in the opinion, *Koopmans* states that the "market rate" of interest to which the crammed down lender is entitled is "the price that it must pay to its own lenders, plus the costs of making and administering loans, plus reserves for bad debts (that is, the anticipated rate of nonrepayment)." *Id.* at 867.

■ The difficulty in applying *Koopmans* to the present case is that, in this case, the creditor's claim is undersecured, and therefore, unlike the loan in *Koop-*

*mans*, is subject to stripdown under § 506(a). For such undersecured loans— which include almost all automobile loans in Chapter 13 cases—the secured creditor is already compensated for the risk of non-repayment through the manner in which § 506(a) is applied. As noted above, the Supreme Court determined in its *Rash* decision, 520 U.S. at 965, 117 S.Ct. at 1886, that the value of a secured claim under § 506(a) should not be measured by the value that a secured creditor could obtain after taking possession of the collateral, but rather on the usually higher price that the debtor would have to pay to obtain a replacement for the collateral. Indeed, the Supreme Court explained that replacement value is required under § 506(a) precisely for the purpose of providing protection to the secured creditor against the risks that the debtor might not make the proposed plan payments and that the collateral might rapidly deteriorate in value. *Rash*, 520 U.S. at 962–63, 117 S.Ct. at 1885 ("Adjustments in the interest rate and secured creditor demands for more 'adequate protection,' 11 U.S.C. § 361, do not fully offset these risks.")

In the situation of automobile loans, a significant amount of risk-compensation is generally provided by replacement valuation under § 506(a). A creditor, repossessing an automobile, would ordinarily be able to obtain no more than the wholesale price of the vehicle, and only after incurring the costs of bringing the vehicle to auction. *See In re Hoskins*, 102 F.3d 311, 312, 315 (7th Cir.1996) (noting that "[t]he price obtained in a liquidation is usually a wholesale rather than a retail price," and observing that a bank repossessing an automobile "would obtain only the wholesale value"). A debtor, on the other hand,

might have to pay the retail cost of the vehicle in order to replace it. See *In re Jenkins*, 215 B.R. 689, 691–92 (Bankr. N.D.Tex.1997), and *In re Russell*, 211 B.R. 12, 14 (Bankr.E.D.N.C.1997) (each suggesting the use of retail price to determine the replacement value of used vehicles under *Rash*).[5] The difference between retail and wholesale values of used vehicles is substantial. In *In re Carlan*, 157 B.R. 324, 325 (Bankr.S.D.Tex.1993), the court considered evidence of an automobile with a wholesale value of $6,050 and a retail value of $7,675, a difference of $1,625, or almost 27% of the wholesale value. And in *Metrobank v. Trimble (In re Trimble)*, 50 F.3d 530, 530 (8th Cir.1995), the parties stipulated that the wholesale value of the debtor's pickup truck was $4,000, but that the retail value was $6,500, an increase of 38% over wholesale.

 *Koopmans* requires that the cramdown interest rate be set so as to give the secured creditor "the indubitable equivalent of its nonbankruptcy entitlement." 102 F.3d at 875. However, since replacement value, in the context of automobile loans, generally provides the secured creditor risk-protection in the form of a substantially greater secured claim than the value the creditor would obtain on repossession outside of bankruptcy, a contract rate of interest cannot be applied to that claim without overcompensating the secured creditor.

The situation of the present case vividly illustrates this potential for overcompensation. What Summit would receive from a repossession of Scott's Plymouth is the wholesale value of the vehicle, which appears from the NADA valuation submitted by the debtor to be approximately $6,550.[6]

---

5. The courts, however, are not uniform in requiring that retail valuation be used under *Rash. See, e.g., In re Oglesby*, 221 B.R. 515, 518–19 (Bankr.D.Colo.1998) (holding that the midpoint between retail and wholesale is the presumptive replacement value).

6. The $6,550 valuation is consistent with the "trade-in" valuation provided by Edmund's

(http://www.edmunds.com/used/1996/plymouth/breeze/4drstdsedan.html# price), which (adjusted for optional equipment included in the debtor's NADA listing) would be $6,760. It might be noted that both the NADA prices provided by the debtor and the Edmund's listing on the internet would require substantial deductions for the excessive mileage on

Under *Koopmans*, Summit should receive a rate of interest that would provide it with these repossession proceeds paid at the interest rate charged for loans of similar risk and duration, which can be assumed to be the 24% per annum provided for in the contract between Summit and Scott. With monthly payments of $200, as specified in Scott's plan, a loan of $6,550 would be paid, at 24% interest, in 54 months, with Summit receiving a total of $10,749 ($4,199 in interest).

The secured claim amount to which the parties have stipulated—the NADA retail valuation of $9,075—already provides Summit with a substantial increase over what it would receive on repossession. If interest is paid on this claim at the 9% rate specified in Scott's plan, then, with the plan's $200 monthly payments, the claim would be paid in 56 months, and Summit would receive slightly more than what *Koopmans* would require, a total of $11,135 ($2,060 in interest).

However, if the 24% contract rate of interest is applied to the stipulated secured claim, then, simply to allow payment within the 60–month maximum allowed by Chapter 13, monthly payments would have to be $261, and Summit would receive a total of $15,664 ($6,589 in interest), far more than the amount required by *Koopmans*.

■ This is simply one example of an economic axiom: applying a rate of interest that fully reflects risk of nonpayment—like the contract rate in the present case—to a secured claim amount that already includes substantial "risk protection" results in a windfall for the secured creditor, to the detriment of unsecured creditors. *Koopmans* does not sanction such a result. To the contrary, in the typical situation of a crammed down auto loan in Chapter 13, an interest rate that reflects an ordinary level of risk will usually be sufficient to provide the secured creditor with the equivalent of its nonbankruptcy remedies. The prime rate, as noted in *Koopmans*, is "the benchmark rate for the banks' most creditworthy customers," but still "includes some compensation for the risk of non-repayment," 102 F.3d at 875, and so the prime rate is a presumptively appropriate one for the cramdown of automobile loans. The 9% rate specified by the debtor in this case was equivalent to the prime rate at the time of plan confirmation. See *Money Rates*, Wall St. J., May 1, 2000, at C26 (reflecting a prime rate of 9% on April 28, 2000).[7]

Of course, the prime rate will not be appropriate in all cases of cramdown. If, as in *Koopmans*, the claim is fully secured, there will be no risk protection included in amount of the secured claim. Similarly, if a debtor were able to demonstrate that the replacement value of collateral under *Rash* was the wholesale price, the secured claim would be valued at the price the creditor would receive on repossession, and there

Scott's vehicle. The retail price to which the parties have stipulated does not include such a deduction. (A copy of the relevant pages from the Edmund's website are attached as an appendix to the copy of this opinion in the court's file.)

7. Section 506(a) requires that valuations of secured claims take place "in conjunction with any hearing ... on a plan affecting [the secured] creditor's interest," and § 1325(a)(4) requires that the value of a crammed down secured claim be measured as of the effective date of the plan. These provisions would appear to require that a court determine the value of a secured claim and the appropriateness of the interest rate as of the date of confirmation. It has been suggested that valuation of a crammed down secured claim in Chapter 13 should occur as of the petition date, on the ground that valuation of the claim at the confirmation date is too problematic. See, e.g., *In re Hudock*, 124 B.R. 532 (Bankr.N.D.Ill.1991). However, the replacement value of the collateral can be determined as easily on the date of confirmation as on the petition date, and interest rate information is available on a daily basis in several business publications. Thus, the date of confirmation is the date on which the secured creditor's secured claim should be valued, and the appropriateness of the proposed interest rate assessed.

would be no risk protection in the amount of that claim under § 506(a). However, the present case, as shown above, is of the much more typical variety—in which there is substantial risk protection included in the amount of the secured claim. Accordingly, the presumption that the prime rate is appropriate has not been overcome by Summit.

### Conclusion

For the reasons discussed above, the debtor's plan provides for interest on crammed down automobile loans at an appropriate rate. Because the cramdown interest rate was the only ground for the creditor's objection to confirmation, and because the plan complies with all of the other requirements for confirmation, the objection is overruled. A separate order of confirmation has previously been entered.