**In re Jose MARQUEZ, Grace M. Marquez, Debtors.**

**No. 00–04038–TUC–EWH.**

United States Bankruptcy Court, D. Arizona.

Oct. 23, 2001.

**764**

---

James L. Robinson, Robinson & Rylander, P.C., Tucson, AZ, for Debtor.

Scott D. Gibson, Jerry S. Smith, Gibson, Nakamura & Decker, P.L.L.C., Tucson, AZ, for ABC Finance Company, Inc.

Dianne C. Kerns, Tucson, AZ, Chapter 13 Trustee.

## AMENDED MEMORANDUM DECISION

EILEEN W. HOLLOWELL,
Bankruptcy Judge.

Pending before the court is the Objection of ABC Finance Company, Inc. ("ABC") to the Confirmation of Debtors' Chapter 13 Plan ("Plan") on the grounds that the Debtors' valuation of ABC's collateral, proposed interest payment on ABC's secured claim, and adequate protection payments are inadequate.

### FACTUAL AND PROCEDURAL HISTORY

On September 24, 2000 the Debtors purchased a used Dodge Intrepid ("Dodge") from Budget Resale, Inc. for $14,999. ABC financed the sale over a 60 month term at an annual interest rate of 26%. Debtors' payments were $430.47 a month.

On October 20th the Debtors filed a pro se Chapter 7 petition. On January 25th the Debtors, represented by counsel, filed a Notice of Conversion to Chapter 13. On February 8, 2001, the Debtors filed a Chapter 13 Plan which treats $11,000 of ABC's claim as secured, to be paid 9% interest over 36 months. The balance of ABC's claim is treated as a general unsecured claim. The Plan attached as Exhibit A an appraisal setting the value of the Dodge at $11,000. The Plan also provides that the Debtors will pay the Chapter 13 Trustee "adequate assurance" payments of $110 a month to compensate ABC for the depreciation of its collateral prior to Plan confirmation.

The Plan term requires the Debtors to make monthly payments of $1,149.00 to the Chapter 13 Trustee for 36 months. Under the Plan, unsecured claims totaling $28,886.00 will receive a 5% distribution.

On May 7, 2001 ABC filed an objection to the confirmation of the Plan disputing the value of the Dodge, the proposed Plan interest rate, and the amount of the adequate protection payments. ABC argued that the Dodge should be valued on a retail basis, that the contract rate of 26% interest should be paid to assure that ABC receives the present value of its secured claim and that it is entitled to adequate protection payments of $430.47 which is the amount of the Debtors' regular monthly payment to ABC.

The Debtors responded to the objection and the court set a hearing on ABC's objection and all other matters regarding confirmation of the Chapter 13 Plan for June 7, 2001 at 1:30 p.m. ABC's counsel failed to appear at the June 7th hearing at which the court overruled ABC's objection. On June 14th counsel for ABC moved for re-consideration on the grounds that he had mistakenly believed that all that would be heard at the June 7th hearing was another creditor's lift stay motion. The Debtors did not oppose the Motion for Reconsideration and on July 3, 2001 the court granted the motion and set an evi-

dentiary hearing (the "Evidentiary Hearing") on ABC's objection for July 24, 2001.

At the Evidentiary Hearing, ABC offered two declarations into evidence. The first, from one of its principals, supported setting the Plan interest at a "sub prime" rate of between 23 and 30%. The second, from its appraiser, asserted that the retail value of the Dodge is $15,500. (ABC Exhibits 1 and 2). On cross examination, ABC's appraiser admitted that he was unaware that Debtors had purchased the Dodge for $14,999 in September of 2000. ABC's appraiser also acknowledged that he regularly does business with ABC, that he did not drive the Dodge, and that the longer the Dodge sat on his used car lot the lower its sale price would be.

The Debtors called, as a valuation witness, the author of the appraisal attached as Exhibit A to the Plan. Debtors' appraiser testified that her value was based on an average of the Kelley Blue Book (KBB) Wholesale Value of $12,950, less a mileage adjustment of $2,050, and a "Black Book" value of $11,000. She then subtracted from that average $1,000 for reconditioning and sales costs. Debtors' appraiser, who has experience in selling used cars and has owned her own appraisal business for a number of years, testified that she treats KBB wholesale values as a retail value because banks do not use Kelly retail values in financing auto purchases. She testified that her "Black Book" value was based on weekly auction reports which list what cars are selling for at auctions in the Mountain Region which includes Arizona. On cross examination, Debtors' appraiser acknowledged that only car dealers have access to such auctions.

At the conclusion of the Evidentiary Hearing, the court ordered the parties to submit post hearing briefs on the issues of value and interest rate. The final brief was filed on August 24, 2001. Because Plan confirmation could not proceed without resolving ABC's objection and because the court's schedule prevented the issuance of a more detailed order, on October 11, 2001, the court issued a brief Memorandum Decision setting forth the value of the Dodge, the Plan interest rate and the amount of the adequate protection payments. The court now amends its October 11th Memorandum Decision to including its Findings of Fact and Conclusions of Law.

### ISSUES TO BE DECIDED

A. What is the value of the Dodge?

B. What is the amount of the adequate protection payments the Debtors must pay to protect ABC from the depreciation value of its collateral?

C. What interest rate must the Debtors pay to ABC to meet the requirement of 1325(a)(5)(B)?

For the reasons set forth below, the court finds that the value of the Dodge is $13,674, that the amount of the monthly adequate protection payment is $136.74, and that the Debtors must pay interest of 9.43% on the secured portion of ABC's claim.

### DISCUSSION

**A. Value of the Dodge**

■ Valuation of motor vehicles under the so called "cram down" provisions of 1325(a)(5)(B) is governed by the *Associates Commercial Corp. v. Rash (In re Rash)*, 520 U.S. 953, 117 S.Ct. 1879, 138 L.Ed.2d 148 (1997). Under *Rash*, the Debtor must pay ABC the replacement value of the Dodge. *Rash* defined replacement value as what a willing buyer, in the Debtors' situation, would pay a willing seller to obtain a car in the same condition as the Dodge. 520 U.S. at 959 at n. 2, 117 S.Ct.

1879. As made evident by the legion of reported bankruptcy decisions since *Rash*, the Supreme Court's definition leaves ample room for interpretation and dispute.

■ In this case, ABC argues that retail value is the replacement value of the Dodge.[1] The Debtors urge the court to adopt an "averaging" approach in setting the Dodge's replacement value. The Sixth Circuit B.A.P. recently approved a method for determining replacement value which uses, as a starting point, the average of the retail and wholesale value of a vehicle. *In re Getz*, 242 B.R. 916 (6th cir. BAP 2000). Such an approach has also been adopted by a number of courts. See, *In re Glueck*, 223 B.R. 514 (Bankr.S.D.Ohio 1998); *In re Lyles*, 226 B.R. 854 (Bankr.W.D.Tenn. 1998); *In re Richards*, 243 B.R. 15 (Bankr. N.D.Ohio 1999).

This court agrees with the averaging approach approved in *Getz*. Such an approach provides a uniform starting point for determining value which the Supreme Court recognized as being necessary in Chapter 13 cases. *Rash*, 520 U.S. at 965, 117 S.Ct. 1879 ("[A] simple rule of valuation is needed to serve the interest of predictability and uniformity"). Using an average between wholesale and retail value as a starting point is also reasonable because many debtors have access to markets other than the car dealer retail market. *Glueck*, 223 B.R. at 519.

■ The decisions which have adopted the averaging approach recognize that, in order to be consistent with the dictates of *Rash*, the average is merely the *starting* point "subject to adjustment by other evidence introduced by the parties". *Getz*, 242 B.R. at 919, *Richards*, 243 B.R. at 18.

In this case, both the Debtor and ABC presented expert evidence on the Dodge's value. ABC's appraiser testified that the retail value of the Dodge was $15,500. At the time ABC's appraiser valued the Dodge, he was unaware that the Dodge was sold in September of 2000 for $14,999. On cross examination, he was unable to provide any credible reason that the Dodge would have appreciated in value in the eleven months after the Debtors purchased it. In fact, ABC has demanded adequate protection payments to protect itself from the depreciation of its collateral. ABC's assertion, that the retail value of the Dodge exceeds its purchase price, is not credible.

■ The court declines to accept the Debtors' appraiser's assertion that the KBB wholesale value for the Dodge of $12,950.00 is equivalent to a retail value. The Debtors' appraiser testified that she treats KBB wholesale value as a retail value because banks finance automobile purchases based on wholesale, not retail, value. However, under *Rash* the court must determine what it would cost the Debtors to replace the Dodge, not what value a bank would use in making a financing decision. Based on the evidence presented, the court finds that the best evidence of the Dodge's retail value is the $14,999 the Debtors paid for the Dodge in September of 2000.

■ In order to use the formula approach approved by the *Getz* court, the court must now determine the wholesale value of the Dodge. ABC presented no

---

1. KBB's web site defines retail value as "the price a dealership might ask" for a vehicle assuming "a fully reconditioned vehicle in excellent condition with a clean title history...[and that] that a dealer has absorbed the cost of making the vehicle ready for sale, reconditioning, advertising, sales commissions, arranging for financing and insurance and standing behind the vehicle for any mechanical or safety problems." Available at <http:www.kbb.com> last visited October 22, 2001.

evidence regarding the Dodge's wholesale value. The Debtors' appraiser used a "Black Book" value of $11,450 as the Dodge's wholesale value. ABC urges the court to ignore the "Black Book" value because the Debtors do not have access to the car auctions whose prices are the basis of that value. The court agrees.

■ The purpose of averaging the wholesale and retail values of the Dodge is to more closely approximate the actual condition of the Dodge and the markets to which the Debtors have access. To adopt a wholesale value based on a market to which the Debtors have no, as opposed to limited, access defeats the purpose of using an average. Accordingly, the court will adopt the KBB wholesale value of $12,950 as the wholesale value of the Dodge and average that value with the $14,999 retail value to calculate the starting point for the Dodge's replacement value. The average, and thus the starting value, is $13,974.50.

■ After arriving at the starting replacement value, the second step in the analysis is to adjust that starting value up or down based upon the actual features and condition of the vehicle because a creditor is not entitled to the value of items the Debtors do not receive. *Rash,* 520 U.S. at 965 n. 6, 117 S.Ct. at 1886 n. 6. To determine the adjustments to be made to the base value, the court must be clear about the assumptions made in KBB wholesale value. KBB defines wholesale value as a value "based on clean vehicles fully reconditioned." *Kelley Blue Book* 4 (Vol.75, No. 9, 2001). Because KBB wholesale value includes reconditioning costs, the starting value includes value that the Debtors do not receive. Accordingly, reconditioning costs must be deducted from the starting value. The Debtors' appraiser estimated the reconditioning costs for the Dodge at $300. ABC presented no evidence on reconditioning costs. The court, therefore, adopts the Debtors' evidence on reconditioning costs. Based on the above analysis, the court finds that the replacement value of the Dodge is the $13,974.50 average of the retail and wholesale values less the $300 reconditioning costs or $13,674.50.

■ The Debtors also urge the court to consider a number of other factors to reduce the replacement value of the Dodge— including the fact that the Dodge was a leased vehicle, the flatness of the current market for used cars, and the promotions being offered by dealers for the purchase of new cars, as well as the costs of advertising and commission costs. The court will not adjust the replacement value for these variables for two reasons. First, many of those factors are "built into" the KBB wholesale value and are, therefore, provided for in the averaging formula. Second, the Debtors' appraiser did not assign any values to those factors, and accordingly there is a no record upon which to make an adjustment.

### B. Pre-confirmation Depreciation and Adequate Protection

■ Three issues may affect replacement value as a result of the post petition but pre-confirmation depreciation of the Dodge: 1) the date the Dodge is valued; 2) the application of the adequate protection payments; and 3) the amount of adequate protection payments due to ABC.

The Debtors urge the court to reduce the Dodge's replacement value based on its monthly depreciation but they do not specify any amount to be deducted for such depreciation. The problem with the Debtors' request is that it makes valuation a moving target for the court and the parties in Chapter 13 cases. While 11 U.S.C. § 1325(a)(4) provides that the value

paid to a secured creditor is to be determined "as of the effective date," using the effective date in this district is impractical. Pursuant to *D. Ariz. Bankr.R.* 2083–2(A), the petition and Chapter 13 plan are filed simultaneously.[2] 11 U.S.C. § 1326 requires Debtors to commence plan payments within 30 days of the filing of a plan. Therefore, in the vast majority of cases, Debtors are making plan payments to the Chapter 13 Trustee, which include payments on secured claims, months before the effective date. It is simply impractical to require the parties to determine the amount of a secured claim on the petition date and then redetermine the amount of a secured claim as of the effective date. As the court noted in, *In re Hudock*, 124 B.R. 532, 534 (Bankr.N.D.Ill.1991), if the effective date is used as the valuation date:

> The creditor could not know the value of its claim until confirmation, and the trustee and debtor could not calculate the amount of payments required under the plan until after the plan's confirmation.

See also, *In re Allen*, 240 B.R. 231 (Bankr. W.D.Va.1999).

Prior to Plan confirmation 11 U.S.C. § 361 entitles creditors, whose collateral is depreciating and who request it, to adequate protection payments to compensate them for the loss of the value of their collateral. If the case is dismissed or stay relief is granted the creditor is entitled to repossess its collateral and to receive the adequate protection payments as compensation for the depreciation of its collateral during the pending of the automatic stay. *In re Farmer*, 257 B.R. 556, 560, (Bankr. D.Mont.2000); *In re Weinstein*, 227 B.R. 284, 296 (9th Cir. BAP 1998).

Once the Plan is confirmed, the undersecured creditor is no longer entitled to adequate protection payments. *In re Kessler*, 86 B.R. 134 (Bankr.C.D.Ill.1988). In order to assure that ABC is not overcompensated by receiving payments based on the replacement value of the Dodge, as of the petition date, the funds earmarked as ABC's adequate protection payments should be applied to its secured claim. The result will be that ABC's secured claim will be reduced by the amount of the adequate protection payments which, in theory, should represent the amount of the Dodge's depreciation between the petition and the effective date.[3]

There remains the question of the amount of the adequate protection payments. In this district, payments of 1% of a vehicle's value are routinely paid by Chapter 13 Debtors to the Chapter 13 Trustee to compensate automobile creditors for the depreciation of their collateral. The Plan proposes such a 1% per month, adequate protection payment based on the Debtors' valuation of the Dodge at $11,000.

■ ABC's Plan objection asserted that it was entitled to adequate protection payments equal to the Debtors regular monthly car payment of $430.37. As an undersecured creditor, the amount of ABC's adequate protection payments is

---

**2.** *D. Ariz. Bankr.R.* 2083–2(a) provides:

> In addition to other documents required to be filed, the debtor shall file an original and four copies of the following:
> (1) Chapter 13 Plan;
> (2) Disclosure Statement of compensation paid or promised to be paid to the debtor's attorney; and

(3) Application and proposed order authorizing payment of filing fee in installments (if needed).

**3.** As an undersecured creditor ABC is not, however, entitled to accrue interest on the secured portion of its claim and the adequate protection payments must, therefore, be applied solely to its secured claim. *Farmer*, 257 B.R. at 562 n. 10.

limited to the depreciation of the value of its collateral. *United Savings Ass'n of Texas v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988); See also *Farmer*, 257 B.R. at 560. ABC presented no evidence to demonstrate that the Dodge's rate of depreciation was the same as the amount of the regular monthly payment. Because the Debtors' regular monthly payment includes ABC's profit and costs, it undoubtedly exceeds the monthly depreciation of the Dodge and violates the requirements of *Timbers*. In the absence of any other evidence regarding depreciation, the court adopts the 1% a month of the replacement value formula set forth in the Plan. $136.74 is the amount of the ABC's adequate protection payment.

### C. Plan Interest Rate

The court must now determine what rate of interest must be paid in order to assure that ABC receives the "present value" of its secured claim as required by § 1325(a)(5)(B)(ii). That interest rate is frequently referred to as the discount or "cram down" rate. Like value, cram down rate determinations in Chapter 13 cases have generated a dizzying number of published opinions.

Three general approaches have emerged in the case law. The "cost of funds" approach requires that the cram down rate be set at the rate the creditor would pay to borrow on its own account. *Hudock*, 124 B.R. at 534; *In re Jordan*, 130 B.R. 185, 190 (Bankr.D.N.J.1991). This approach is necessarily creditor specific since creditors will have access to different borrowing sources depending on the creditor's financial position and worthiness. For example, ABC's ability to borrow money will be different from Bank of America's.

The second approach is the "forced loan" approach which sets the cram down rate at the rate the creditor would have obtained had it made a new loan to the debtor. *United Carolina Bank v. Hall*, 993 F.2d 1126, 1130 (4th Cir.1993). Under the "forced loan" approach, the contract rate of interest is often held to be the presumptive rate. See e.g. *In re Smithwick*, 121 F.3d 211, 213–14 (5th Cir. 1997). *General Motors Acceptance Corp. v. Jones*, 999 F.2d 63, 71 (3rd Cir.1993). This approach is also creditor specific since it is tied to the lending creditor's interest rate. *Jones*, 999 F.2d at 71. ("The appropriate rate is that charged by the *particular* creditor forced to extend credit".) (emphasis added)

The third approach is a "formula" approach which calculates the cram down rate by adding a risk premium to some standard "risk free" base rate such as, a U.S. Treasury instrument or the prime rate. *In re Valenti*, 105 F.3d 55, (2nd Cir.1997). *In re Knight*, 254 B.R. 227, 229–30 (Bankr.D.Ill.2000).

Courts which have used the "formula" approach have adopted a number of different base rates. "Risk free" treasury bill rates, with a maturity date that matches the plan term, *Valenti* 105 F.3d at 63–64, statutory judgment rates *In re Clark*, 168 B.R. 280, 284 (Bankr.W.D.N.Y.1994) and the prime rate of interest *Knight*, 254 B.R. at 229, have all been used as a base rate.

In this circuit, bankruptcy courts are accorded substantial deference in making cram down interest rate determinations. *In re Camino Real Landscape Mant. Contractors*, 818 F.2d 1503, 1508 (9th Cir.1987). The Ninth Circuit has specifically approved the use of a formula approach in determining the cram down rate. *In re Fowler*, 903 F.2d 694 (1990). ABC, relying on *Jones*, urges the court to adopt the "forced loan" approach and set the cram down rate either at its contract

rate or at a sub prime rate between 23% and 30%. The Debtors relying on *Fowler,* urge the court to adopt the formula approach using the prime rate of interest as the base with an addition for risk.

■ The court declines to adopt either the "forced loan" or the "prime plus risk formula". Instead, the court will adopt a formula approach which uses the average interest rate for conventional used car loans for a 36 month term in this region as a base. 8.68% is currently the average conventional 36 month used car loan interest rate in this region.[4] For the reasons set forth below, the court finds that an additional .75% should be added to the base as a risk premium. Using the court's formula approach, the appropriate discount rate to be paid to ABC pursuant to § 1325(a)(5)(B)(ii) is 9.43%.

### 1. ABC is not entitled to its contract or other above market rate.

ABC argues that its 24% contract rate of interest should be adopted as the cram down rate to assure that it receives the present value of its claim. However, because ABC's secured claim is the replacement rather than the liquidation value of the Dodge, adopting ABC's contract rate would overcompensate it for its claim at the expense of the unsecured creditors. As noted by the court in *In re Scott,* 248 B.R. 786, 792 (Bankr.N.D.Ill.2000):

> [S]ince replacement value, in the context of automobile loans, generally provides the secured creditor risk protection in the form of a substantially greater secured claim than the value the creditor would obtain on repossession outside of bankruptcy, a contract rate of interest cannot be applied to that claim without overcompensating the secured creditor.

The *Scott* court found that in the "typical" Chapter 13 an interest rate that reflects an ordinary level of risk is sufficient, *Id.* at 793. See also *In re Richards,* 243 B.R. at 22.

■ The determination of an interest rate, which will provide ABC with the present value of its claim, should not be controlled by a rate negotiated pre-petition between the parties. Such pre-petition rates include the lender's profits and costs but all that is required under § 1325(a)(5)(B) is that ABC receive the present value of its claim adjusted for inflation and delay in payment. *Richards,* 243 B.R. at 22.

The *Richards* court also noted that allowing creditors, such as ABC, to receive interest at a contract rate, which is substantially above conventional rates, may violate the Code's treatment of secured creditors:

> Section 506(b) forbids undersecured creditors from collecting post-petition interest on their claims, while permitting oversecured creditors to collect post-petition interest to the extent of the value of the collateral.... [A]llowing interest on secured claims at rates that greatly exceed conventional rates may enable undersecured creditors to sneak impermissible post-petition interest into the calculation of the present value of their claims. Such an occurrence would permit an undersecured creditor to gain the rights of an oversecured creditor in this regard, and this is clearly forbidden by 506(b). 243 B.R. at 23.

ABC argues that the only interest rate which satisfies 1325(a)(5)(B) "is one which allows the creditor to receive interest

---

**4.** available at *<http://www.bankrate.com/brm/ratc/ratetable state.asp.>* (last visited October 3, 2001).

equal to the rate it would charge for a loan of similar character, amount and duration." ABC's principal testified that ABC would treat the Debtors' as sub prime borrowers and charge between 23% and 30% if it were to make a new loan to the Debtors under the Plan's terms. As the Court of Appeals for the 2nd Circuit observed in *Valenti*, the "forced loan" approach,

> misapprehends the "present value" function of the interest rate. The objective of § 1325(a)(5)(B)(ii) is to put the creditor in the same economic position that it would have been in had it received the value of its allowed claim immediately. The purpose is not to put the creditor in the same position that it would have been in had it arranged a "new" loan. See *In re Dingley*, 189 B.R. [264, 269 (Bankr.N.D.N.Y.1995) ](noting that courts favoring the "forced loan" approach "impermissibly recast present value 'so as to preserve the present value of the loan' as opposed to the secured claim"). 105 F.3d at 63, 64.

Judge Lundin explains the problem with such creditor specific approaches as follows:

> Nothing in § 1325(a)(5)(B)(ii) suggests that 'value as of the effective date of the plan' is a creditor specific concept. If present value varies from creditor to creditor depending on facts specific to each creditor's financial condition, management and lending practices, then the interest rate at confirmation in a Chapter 13 case will be different with respect to every claim, with respect to every creditor, with respect to every day and all of the relevant evidence is proprietary to the holder of the secured claim. It is not imaginable that Congress intended 'value as of the effective date of

the plan' to mean that inefficient, poorly managed lenders get higher interest rates than well managed, better capitalized lenders. Keith M. Lundin, *Chapter 13 Bankruptcy* § 112—8 (3rd ed.2000).

Such creditor specific approaches are not required under *Fowler* which held that in determining the cram down rate "the court must consider the prevailing market rate for a loan of a term equal to the payout period, with due consideration of the quality of the security and the risk of subsequent default." 903 F.2d at 697. Adopting a cram down rate based on a formula which uses, as its base, the average conventional rate for used car loans plus a risk factor meets the requirements of *Fowler*.

## 2. Conventional loan rates should be used as the base rate in calculating the cram down rate.

The Debtors urge the court to use the prime rate of interest as the base rate in calculating the formula to determine the cram down rate. The prime rate of interest is usually defined as "the lowest rate of interest, from time to time, charged by a specific lender, to its best customers, for short term unsecured loans". *Black's Law Dictionary* 818 (7th ed.1999). The prime rate of interest is currently 5.50%[5] Because the court, like the court in *Scott*, finds that most Chapter 13 cases do not involve an extraordinary high risk, the court should adopt the Debtors' approach, the Debtors would be able to pay less interest through their Chapter 13 Plan than non-debtor purchasers of used vehicles in the conventional market place. 248 B.R. at 793. Such a result is not permitted under *Fowler* which requires the court

---

5. Available at <http:www.nsfb.com/library/prime.htm>(last visited October 9, 2001).

to adopt a cram down rate based on "the current market interest rate for similar loans in the region." 903 F.2d at 697.

As noted above, the average rate of interest for a conventional 36 month used car loan in the Arizona and Nevada region is currently 8.68%. The court finds that the average regional interest rate for conventional used car loans is a more accurate measure of the interest rate associated with the used car market than the prime rate and will therefore adopt that rate as a base. A similar approach was used by the bankruptcy court in *In re St. Cloud*, 209 B.R. 801 (Bankr.D.Mass.1997) where the court used the average annual interest rate for a 30 year fixed mortgage as a base and then made additions for risk.

Adopting the average conventional loan rate for used car loans as a base will also make it relatively easy for the court and practitioners to determine the applicable cram down rate since conventional loan rates for used car purchases are now regularly published on the Internet by a number of companies, including Bankrate.com.[6]

■ Having determined the base rate under the formula approach, the court must now explain how it has arrived at a .75% risk factor. *Fowler*, 903 F.2d at 698, 699 (requiring specific findings to justify risk factor). There are no exceptional circumstances in this case indicating that ABC is facing any special risks, other than the risk confronted by all creditors in Chapter 13, that the Plan may fail. On the other hand Chapter 13 provides ABC with certain protections that are unavailable to it in dealing with its non-bankrupt borrowers. Because the Dodge's cram down value is its replacement value rather than its liquidation value, ABC is receiving greater risk protection than it would receive on repossession of the Dodge outside

of Bankruptcy, *Scott*, 248 B.R. at 792. ABC is also protected by the presence of a Chapter 13 Trustee who collects ABC's payments and monitors the Debtors' performance under the Plan. In the event of a Plan default, ABC has ready access to this court for relief from stay. *Knight*, 254 B.R. at 230; *Dingley*, 189 B.R. at 272.

Based on the above listed factors, the court does not find that there should be a substantial upward adjustment made to the base rate of interest. *Fowler*, 903 F.2d at 697. However, because ABC is now making a loan at a 100% loan to value ratio and because of the inherent risk in every Chapter 13 case that the plan may fail the court finds that a .75% should be added to the base rate as a risk premium. The interest rate that the Debtors must, therefore, pay to ABC under § 1325(a)(5)(B)(ii) is 9.43%.

## D. Conclusion

The foregoing constitutes the court's Findings of Fact and Conclusions of Law pursuant to *Fed. R. Bankr.P.* 7052. The court will enter a separate order overruling, in part, ABC's objection to confirmation of the Plan and requiring the Debtors to amend their Chapter 13 Plan to provide for the payment of ABC's secured claim in accordance with the terms of this amended memorandum decision.

---

6. A copy of the rates from web site attached as an appendix to this memorandum decision.