**In re Russell Mark RICHARDS and Loralee Marie Richards, Debtors.**

**Bankruptcy No. 99–41713.**

United States Bankruptcy Court, N.D. Ohio.

Dec. 20, 1999.

Robert A. Ciotola, Canfield, OH, for Debtors.

Barbara Friedman Yaksic, Cleveland, OH, for Creditor.

Donald M. Robiner, Cleveland, OH, United States Trustee.

## MEMORANDUM OPINION

WILLIAM T. BODOH, Bankruptcy Judge.

This cause is before the Court on the objection of Household Automotive Finance Corporation ("Household") to the confirmation of the proposed Chapter 13 plan of Russell Mark and Loralee Marie Richards ("Debtors") and the objection of Debtors to Household's proof of claim. This is a core proceeding over which the Court has jurisdiction pursuant to 28 U.S.C. § 157(b)(2)(B) and (L). A hearing was held in this matter on October 28, 1999. Barbara Friedman Yaksic, Esq. appeared on behalf of Household. Robert A. Ciotola, Esq. appeared on behalf of Debtors. The following constitutes the Court's findings of fact and conclusions of law pursuant to FED.R.BANKR.P. 7052.

## DISCUSSION

### A. *Facts*

On February 24, 1999, Debtors purchased a 1994 Ford F–150 pickup truck, VIN # 1FTDF15Y3RNB51628, from an automobile dealer in Sharon, Pennsylvania. This purchase was financed by a loan supplied by Household in the amount of Ten Thousand Two Hundred Ninety–Seven and 75/100 Dollars ($10,297.75) at an interest rate of 20.95%. On June 10, 1999, Debtors filed a voluntary petition for relief under Chapter 13 of Title 11, United States Code. Debtors' Schedule B lists the vehicle as having a market value of Six Thousand Dollars ($6,000.00). Debtors' plan proposes to pay Household 100% of the secured value of its claim and 10% of the unsecured value of its claim.

On July 27, 1999, Household filed an objection to the confirmation of Debtors' plan with this Court. The basis of Household's objection is that Debtors' plan "does not provide for the secured repayment inside the Plan to be paid at the note rate of 20.95% per annum." (Household Objec-

tion to Confirmation of Chapter 13 Plan, at ¶ 4.) Additionally, Household asserted that Debtors' valuation of the vehicle was too low and that the secured value of its claim should be Ten Thousand Three Hundred Fifty Dollars ($10,350.00).[1] On August 4, 1999, Debtors filed an objection to Household's proof of claim, which was amended on September 29, 1999. Debtors' objection requests that Household's claim be deemed to be secured only in the amount of Six Thousand Dollars ($6,000.00) and that interest on the claim should be paid at a rate of 10%.

## B. Issue

There are two issues that must be resolved by the Court. First, the Court must determine the proper manner in which to value Household's claim against Debtors. Second, the Court must ascertain the amount of interest that Household is entitled to receive on its claim.

## C. Analysis

11 U.S.C. § 506(a) provides:

An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

■ It is undisputed in this matter that Household holds a valid security interest in Debtors' Ford F–150, thus § 506(a) is

applicable to determine the value of Household's claim. The first step in this process is to determine the value of Debtors' Ford F–150, for § 506(a) indicates that Household's claim is secured only to the extent of the value of the collateral. *Id.* In *Associates Commercial Corp. v. Rash,* 520 U.S. 953, 117 S.Ct. 1879, 138 L.Ed.2d 148 (1997), the Supreme Court held that in "a 'cram down' case, ... the value of the property (and thus the amount of the secured claim under § 506(a)) is the price a willing buyer in the debtor's trade, business, or situation would pay to obtain like property from a willing seller." *Id.* at 1884. The Supreme Court refers to this as the collateral's "replacement value." *Id.*

Household asserts that we should determine the replacement value of the collateral by averaging the trade-in and retail values of a 1994 Ford F–150 as listed in the *N.A.D.A. Official Used Car Guide, Central Edition.* Household contends that the values listed in the *N.A.D.A.* guide accurately reflect the current market value for similar vehicles in the region.

Debtors contend that a narrower interpretation of *Rash* is warranted under the circumstances. The thrust of Debtors' argument is that replacement value should be determined by ascertaining the price that Debtors would actually pay to purchase a vehicle of similar make, model, year, mileage and accessories. To this end, Debtors reject the *N.A.D.A.* values as reflecting only a guideline to assist automobile dealers in the evaluation of used vehicles. Debtors assert that they could replace their 1994 Ford F–150 with a similar vehicle for a lower price than is listed in the *N.A.D.A.* guidebooks.

■ At the hearing, Debtors attempted to establish the replacement value of their vehicle by several methods. First, Debtors submitted Exhibit A, which is a 104

---

1. Debtors filed an amended plan on August 17, 1999 that proposed the same repayment terms in regard to Household's claim.

page document titled *Automart.* Debtors' Exhibit A appears to be a periodic publication which is solely composed of advertisements posted by various used car dealers in northwest Pennsylvania. Page 90 of Debtors' Exhibit A lists a 1996 Ford F–150 XL for sale at a price of Seven Thousand Five Hundred Seventy–Five Dollars ($7,575.00). This appears to be the only price listed for a Ford F–150 in the entire publication. This exhibit is of dubious value in determining the replacement value of Debtors' vehicle, however, as the truck listed in the exhibit is a 1996 model and does not indicate the vehicle's condition or mileage. Accordingly, Exhibit A is not probative of the replacement value of Debtors' vehicle and we will not consider it in determining the value of the Ford F–150.

■ Debtors also sought to establish the replacement value of their vehicle through the testimony of Tony Costarella, who is a finance manager at a local automobile dealership. Mr. Costarella testified that he frequently attends automobile auctions where used vehicles are sold at wholesale prices. Mr. Costarella also testified that he could procure a 1994 Ford F–150 for Debtors for which he would charge a fee of Two Hundred Dollars ($200.00) as well as an auction purchase fee which ranges from One Hundred Fifty to Two Hundred Dollars ($150.00 – $200.00). Mr. Costarella testified that he could purchase a similar Ford F–150 for Debtors at auction for approximately Four Thousand Five Hundred Dollars ($4,500.00). Mr. Costarella bases this opinion on the fact that 1994 Ford F–150s with accessories and mileage similar to that owned by Debtors have sold for this price at recent auctions.[2]

■ In footnote 2 of the *Rash* decision, the Court stated that:

> By using the term "replacement value," we do not suggest that a creditor is entitled to recover what it would cost the debtor to purchase the collateral brand new. Rather, our use of the term replacement value is consistent with the Ninth Circuit's understanding of the meaning of fair-market value; by replacement value, we mean the price a willing buyer in the debtor's trade, business, or situation would pay a willing seller to obtain property of like age and condition.

*Rash,* 117 S.Ct. at 1884, n. 2.

■ Thus, a thorough reading of *Rash* indicates that the phrase "replacement value" is a term of art, and that what courts are supposed to determine under § 506(a) is the fair market value of the collateral securing the claim. Our task, then, is to discover the proper method for establishing the fair market value of a used vehicle.

In *In re Glueck,* 223 B.R. 514 (Bankr. S.D.Ohio 1998), the Bankruptcy Court for the Southern District of Ohio held that it would use the average of the wholesale and retail values as established by used vehicle guide books as a starting point for determining the replacement value of an automobile. *Id.* at 519–20, *see In re Lyles,* 226 B.R. 854, 856–57 (Bankr.W.D.Tenn. 1998); *In re Sharon,* 200 B.R. 181, 186 (Bankr.S.D.Ohio 1996). This holding was based upon three factors. First, the court stated that "it would be prohibitively costly to require expert testimony for determination of value of every automobile in Chapter 13 proceedings." *Glueck,* 223 B.R. at 519. Second, the court reasoned that the

---

**2.** Debtors also introduced Exhibits B, C, D and E, which purported to be appraisals of Debtors' vehicle performed by four separate automobile dealers. However, the individuals who prepared the appraisals were not present to testify at the hearing. The Court concluded that it would receive the exhibits into evidence since it appeared that Mr. Richards personally received the appraisals from the individuals who prepared them, and thus could identify what they purport to be, but the Court also ruled that the probative value of these exhibits would be negligible because they are clearly hearsay and the individuals who prepared them were not present to testify before the Court. Accordingly, the Court will not consider these exhibits in determining the replacement value of Debtors' vehicle.

average between wholesale and retail values should be used because many debtors have access to markets other than the retail market, and thus could obtain a used vehicle for less than the standard retail price. *Id.* Third, the court concluded that used vehicle guide books "provide objective and authoritative evidence of retail and wholesale values." *Id.*

■ We find the reasoning of *Glueck* to be persuasive for two reasons. First, we believe that *Glueck's* method of establishing replacement value will result in a more accurate assessment of a vehicle's fair market value than that proposed by Debtors. We believe this to be so because the *Glueck* method focuses on the value of the collateral in the market as a whole rather than focusing on a particular subset of the automobile sales industry. Second, we are of the opinion that adopting this method will be a more cost effective means of determining the replacement value of used automobiles. Accordingly, this Court will use the average of a vehicle's retail and wholesale values as established in a used car guide to determine its replacement value pursuant to 11 U.S.C. § 506(a). However, the Court will also consider additional probative evidence of a vehicle's value if offered, such as an expert evaluation of the automobile.

■ We now turn to the valuation of Debtors' vehicle. The *N.A.D.A. Official Used Car Guide, Central Edition,* June 1999, indicates that a 1994 Ford F–150 has a wholesale value of Seven Thousand Three Hundred Dollars ($7,300.00) and a retail value of Nine Thousand Three Hundred Dollars ($9,300.00). The average of these two values is Eight Thousand Three Hundred Dollars ($8,300.00).

Household contends that this figure should be increased to include the value of the following accessories: a sliding rear window, bed liner, fiberglass cap, trailer towing package and aluminum alloy wheels. Household asserts that these accessories increase the value of Debtors' vehicle by Eight Hundred Twenty–Five Dollars ($825.00) (Household Exhibit 2). However, Household's assertion that Debtors' automobile is equipped with these accessories was not supported by the testimony of any witness who personally inspected the vehicle in question. On the other hand, both Mr. Richards and Mr. Costarella testified that Debtors' Ford F–150 is not equipped with any of these special accessories. As the testimony of these two witnesses is based upon their personal inspections of the vehicle, the Court credits their testimony and concludes that Debtors' vehicle is not equipped with any special accessories. Accordingly, the value of the Ford F–150 will not be increased to reflect any accessories.

Household Exhibit 2 appears to be a hard copy of a computer version of the *N.A.D.A. Official Used Car Guide, Central Edition* for June of 1999, and it indicates that the value of a Ford F–150 should be reduced by Four Hundred Fifty Dollars ($450.00) if it is equipped with only a six cylinder engine. Both Mr. Richards and Mr. Costarella testified that Debtors' vehicle is equipped with a six cylinder engine, and Household did not seek to contradict this testimony. Accordingly, the Court will reduce the replacement value of Debtors' Ford F–150 by Four Hundred Fifty Dollars ($450.00), which results in a replacement value of Seven Thousand Eight Hundred Fifty Dollars ($7,850.00).

Household also argues that the value of Debtors' vehicle should be increased by Six Hundred Seventy–Five Dollars ($675.00) to reflect the automobile's mileage. Counsel for both parties have stipulated that at the time Debtors filed their petition, the Ford F–150's mileage was between 50,000 to 55,000 miles. Household's argument is not well taken. The *N.A.D.A.* contains a method for reducing the value of an automobile due to excessive mileage, but this Court is unaware of any accepted practice that would actually increase the value of an automobile based

upon its mileage. Our perusal of the relevant *N.A.D.A.* guidebook indicates that the value of Debtors' Ford F–150 would not be adjusted based upon the vehicle's stipulated mileage at the time of filing. Accordingly, the value of Debtors' vehicle will not be adjusted to reflect its mileage.

Having addressed the value of Debtors' vehicle, the Court must now assess the amount of interest that Household is entitled to receive on its claim. The resolution of this issue requires us to consider 11 U.S.C. § 1325(a)(5), which provides that a bankruptcy court shall confirm a plan if:

with respect to each allowed secured claim provided for by the plan—

. . .

(B)(i) the plan provides that the holder of such claim retain the lien securing such claim; and

(ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim[.]

Debtors' plan provides that Household shall retain its lien on the Ford F–150. The crux of the parties' disagreement involves the value of the property to be distributed under the plan on account of Household's claim. Household asserts that § 1325(a)(5)(B)(ii) mandates that Household is entitled to interest on the secured value of its claim at the contract rate of 20.95%. Debtors do not dispute that § 1325(a)(5)(B)(ii) entitles Household to receive interest on its claim, but they assert that Household is only entitled to interest at a rate of 10%.

The Court of Appeals for the Sixth Circuit addressed the meaning of § 1325(a)(5)(B) in *Memphis Bank & Trust Co. v. Whitman*, 692 F.2d 427 (6th Cir. 1982). The court of appeals held that in setting the proper rate of interest on a secured claim that "[r]ather than tying the interest rate to an arbitrary ten per cent rate, . . . or some other arbitrary rate, we

hold that in the absence of special circumstances bankruptcy courts should use the current market rate of interest used for similar loans in the region." *Id.* at 431. The court interpreted § 1325(a)(5)(B) to require "the creditor to make a new loan in the amount of the value of the collateral rather than repossess it, and the creditor is entitled to interest on his loan." *Id.* at 429.

In *Cardinal Federal Savings & Loan Association v. Colegrove (In re Colegrove )*, 771 F.2d 119 (6th Cir.1985), the court held that *Memphis Bank* mandated that the rate of interest allowed on a secured claim can be no greater than the rate provided for in the underlying contract. *Id.* at 123. This holding was later limited by the court to apply only in those situations where the secured creditor's claim is not subject to the cram-down provisions of § 1325(a)(5)(B). *United States v. Arnold*, 878 F.2d 925, 929–30 (6th Cir.1989).

It is clear, then, that according to *Memphis Bank*, Household is entitled to the current market rate of interest used for similar loans in this region on its secured claim. What is not clear is how this Court should determine what is the current market rate of interest.

Household argues that *Memphis Bank* requires this Court to determine the market rate of interest based upon the rate that a lender would charge a potential borrower with a credit history similar to that of Debtors. To this end, Household introduced the testimony of Joe Brewer, a Household employee who specializes in loans to high-risk individuals for the purpose of obtaining an automobile. Mr. Brewer testified he is Household's regional sales director for the Great Lakes region, a position he has held for the past four years. Mr. Brewer also testified that Household looks to a variety of factors to determine if a potential borrower is in the high-risk category, such as past credit history, repossessions and bankruptcy filings. Mr. Brewer stated that if Debtors were to seek an automobile loan from Household

at the present time, they would be identified as high-risk borrowers due to the fact that they have recently filed a bankruptcy petition and that Mr. Richards has had a vehicle repossessed in the past. According to Mr. Brewer, Household would assess a 20.95% rate of interest on any loan they might provide to Debtors. Mr. Brewer also testified that this 20.95% interest rate is the standard rate charged by lenders to high-risk borrowers in this region.

Debtors assert that *Memphis Bank* requires the Court to not consider Debtors' credit history in determining the current market rate of interest allowed on Household's claim. Debtors contend that the market rate to be used by the Court should be the conventional interest rate for automobile loans in the region. Debtors contend that the conventional rate in this region is 10%. Alternatively, Debtors assert that if this Court does take Debtors' credit history into account, they could obtain an automobile loan with an interest rate far below 20.95%. Indeed, Mr. Costarella testified that he believed that he could obtain an automobile loan for Debtors at a rate of 10.9% to 12.9%, even considering their credit history.

We must decide, then, whether we should take Debtors' credit history into account in determining the rate of interest to which Household is entitled to receive on the secured portion of its claim. It appears that the bankruptcy courts in this circuit are divided on this issue. In *In re Stanley*, 216 B.R. 929 (Bankr.S.D.Ohio 1997), the court held that *Memphis Trust* required the court to use the conventional rate of interest on automobile loans in the region and not the rate that would be charged to a high-risk borrower. *Id.* at 932. The court concluded that this outcome was required because:

Confining the inquiry to automobile loans made to high risk borrowers, as First Lenders argues, eliminates any substantial difference between market rates and contract rates. According to First Lenders the market rate and the

contract rate are the same. Even in the presence of special circumstances such an interpretation eviscerates *Memphis Bank* and guarantees that First Lenders receive the contract rate. *Memphis Bank* does not support such a predetermined result.

*Id.*

A contrary result was reached in *In re Glueck*, 223 B.R. 514, 521–22 (Bankr. S.D.Ohio 1998). Here, the court reasoned that "the 'current market rate' and 'similar loans' language of *Memphis Bank* requires the Court to establish an interest rate available to borrowers with similar credit histories to that of the relevant debtors. Any other finding would effectively negate the language in *Memphis Bank.*" *Id.* at 521. The court also felt that this result was required due to *Memphis Bank*'s use of the coerced loan theory in establishing the current market rate formulation. *Id.* The court recognized that:

Accordingly, in applying "value, as of the effective date of the plan," bankruptcy courts should endeavor to leave the secured creditor as well off as if it had been paid the amount of its secured claim in cash. The cram down interest rate should reflect what the secured creditor would have earned had it taken that cash and reinvested it in loans with terms comparable to the terms proposed by the debtor's plan and with risks comparable to the risks presented by the debtor's nonpayment.... [B]ankruptcy courts may conclude that the rate in the contract is the most credible evidence of what the secured creditor would have earned had it been paid a cash amount equal to the value of its secured claim and reinvested that cash in a loan comparable to the terms and risks presented by the debtor's plan.

*Id.* at 521–22, quoting David G. Epstein, *Don't Go and Do Something Rash About Cram Down Interest Rates,* 49 Ala. L.Rev. 435, 468 (1998).

We believe that much of the disagreement in this area is caused by focusing too much attention on the coerced loan theory expressed in *Memphis Bank* and paying too little attention to the language of § 1325(a)(5)(B) and the purpose behind the court's reasoning in *Memphis Bank*. Section 1325(a)(5)(B)(ii) states that we shall confirm a plan if "the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim." *Memphis Bank* interpreted this section to "require the Bankruptcy Court to assess interest on the secured claim for the present value of the collateral (if it is not to be paid immediately) in order not to dilute the value of that claim through delay in payment." *Memphis Bank*, 692 F.2d at 429.

The principle underlying *Memphis Bank's* interpretation is not difficult to grasp. Section 1325(a)(5)(B) provides that a secured creditor must receive payment equal to the value of the collateral as of the effective date of the plan. If the plan proposes to pay the secured creditor the full value of the collateral over a period of 60 months, the creditor will actually receive less than what he is entitled to due to the simple fact that a sum of money received over 60 months does not have the same value as a sum of money received today. The purpose behind *Memphis Bank*, then, is to ensure that when a secured creditor's claim is paid over a period of several months, he receives the present value of his claim adjusted for inflation and delay in payment. It is our understanding that the court believed that current market rates of interest would best approximate the present value of a secured claim.

With this understanding of *Memphis Bank* in mind, we reject the reasoning of *Glueck*. To permit a secured creditor to receive interest on his claim in an amount greater than the conventional market rates would allow the creditor to actually receive more than the allowed amount of his secured claim. Therefore, if this Court were to allow interest on Household's claim based upon the current market rate for high risk borrowers as opposed to conventional market rates, we would allow Household to ultimately recover an amount greater than the present value of the collateral securing the claim. This result is clearly contrary to the language of § 506(a), § 1325(a)(5)(B) and *Memphis Bank*. Additionally, we interpret the court's language in *Memphis Bank* that "[b]ankruptcy courts are generally familiar with the current conventional rates on various types of consumer loans," *Memphis Bank*, 692 F.2d at 431, as implicitly authorizing the use of conventional market rates of interest.

The Court also disagrees with the assertion that the cram down interest rate should take into account the profit that the secured creditor would have received had he been paid immediately and reinvested the proceeds. This argument assumes too much, for the Court cannot speculate on how a secured creditor may use the money he receives in satisfaction of his claim. Additionally, we do not read into § 1325(a)(5)(B) or *Memphis Bank* a requirement that an undersecured creditor is entitled to receive the profits from any unrealized investment opportunities resulting from delay in payment. Section 1325(a)(5)(B) mandates only that the secured creditor receive the value of the collateral securing the claim, not any proceeds that may be realized from the liquidation of that claim.[3]

---

**3.** The Supreme Court has indicated in dicta that in § 506(a):

the creditor's "interest in property" obviously means his security interest without taking account of his right to immediate possession of the collateral on default. If the latter were included, the "value of such

creditor's interest" would increase, and the proportions of the claim that are secured and unsecured would alter, as the stay continues—since the value of the entitlement to use the collateral from the date of bankruptcy would rise with the passage of time. No one suggests this was intended. The

We are also concerned that allowing Household to receive interest on its claim above conventional market rates may frustrate the Bankruptcy Code's treatment of secured creditors. Section 506(b) forbids undersecured creditors from collecting post-petition interest on their claims, while permitting oversecured creditors to collect post-petition interest to the extent of the value of the collateral.[4] Our concern here is that allowing interest on secured claims at rates that greatly exceed conventional rates may enable undersecured creditors to sneak impermissible post-petition interest into the calculation of the present value of their claims. Such an occurrence would permit an undersecured creditor to gain the rights of an oversecured creditor in this regard, and this is clearly forbidden by § 506(b).

Accordingly, this Court will use the conventional market rate for automobile loans in this region to determine the rate of interest to which Household is entitled on the secured portion of its claim. The periodical, *The Business Journal*, lists conventional interest rates local banks assess on automobile loans in this region. We believe the best method of determining the current market rate of interest is to use the midpoint of the average interest rate and the highest rate assessed on automobile loans in this region. According to the latest edition of *The Business Journal*, volume 16 number 8, the average interest rate for a 60–month automobile loan in this region is 8.15%, with the highest rate quoted at 16.50%. This results in a midpoint of 12.325%, which will be the rate of interest to which Household is entitled on its claim.

### CONCLUSION

For the reasons stated above, the Court finds that the replacement value of Debtors' Ford F–150 is Seven Thousand Eight Hundred Fifty Dollars ($7,850.00). The Court also finds that Household is entitled to interest on the secured portion of its claim at a rate of 12.325%, which is the current market rate of interest for similar loans in this region. Accordingly, Household's objection to the confirmation of Debtors' plan is sustained in part and overruled in part, and Debtors' objection to Household's proof of claim is sustained in part and overruled in part.

---

phrase "value of such creditor's interest" in § 506(a) means "the value of the collateral."

*United Savs. Ass'n. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 372, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988).

The Court's interpretation of § 506(a) suggests that secured creditors are not entitled to receive interest on their claims to account for profits and investment opportunities that are lost as a result of delay in payment. Although the Court addressed this issue in the framework of a motion for relief from the automatic stay in a Chapter 11 proceeding, we feel that this analysis is equally persuasive in determining the present value of an undersecured creditor's claim pursuant to § 1325(a)(5)(B), since this determination is inherently dependent upon the valuation procedure set forth in § 506(a).

4. 11 U.S.C. § 506(b) provides:

To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.