RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
ELECTRONIC CITATION: 2003 FED App. 0005P (6th Cir.)
File Name: 03a0005p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

—————————————

In re: LEWIS KIDD and
ROBERTA KIDD,

        *Debtors.*

—————————————————

HOUSEHOLD AUTOMOTIVE
FINANCE CORPORATION,

        *Appellant,*

    *v.*

BEVERLY BURDEN, Trustee,

        *Appellee.*

No. 01-5074

Appeal from the United States District Court
for the Eastern District of Kentucky at Pikeville.
No. 00-00400—Joseph M. Hood, District Judge.

Argued: April 23, 2002

Decided and Filed: January 8, 2003

1

Before: DAUGHTREY and MOORE, Circuit Judges;
SIMPSON, District Judge.[*]

————————————

**COUNSEL**

**ARGUED:** Lea P. Goff, STOLL, KEENON & PARK, Louisville, Kentucky, for Appellant. Caitlin L. Decatur, DECATUR & LEE, Batavia, Ohio, for Appellee. **ON BRIEF:** Lea P. Goff, Samuel D. Hinkle, STOLL, KEENON & PARK, Louisville, Kentucky, George D. Smith, STOLL, KEENON & PARK, Lexington, Kentucky, for Appellant. Caitlin L. Decatur, DECATUR & LEE, Batavia, Ohio, for Appellee.

DAUGHTREY, J., delivered the opinion of the court, in which MOORE, J., joined. SIMPSON, D. J. (pp. 14-17), delivered a separate opinion concurring in part and dissenting in part.

————————————

**OPINION**

————————————

MARTHA CRAIG DAUGHTREY, Circuit Judge. In this bankruptcy appeal, we are asked to review the bankruptcy court's calculation of the appropriate interest rate to be applied in a "cram down" provision in the debtors' Chapter 13 plan. The decision requires interpretation of language in the controlling case of *Memphis Bank & Trust Co. v. Whitman,* 692 F.2d 427 (6th Cir. 1982). There we adopted what has since become known as the "coerced loan" formulation in the application of 11 U.S.C. § 1325(a)(5)(B), which is the Chapter 13 provision that has been held to permit confirmation of a plan proposed by the debtor over the

———————————————————

[*] The Honorable Charles R. Simpson III, United States District Judge for the Western District of Kentucky, sitting by designation.

objection of the holder of a secured claim. Here, the sales contract for the debtors' pickup truck imposed an interest rate of 20.95%, allegedly due to the purchasers' poor credit rating. The Chapter 13 plan proposed a rate of 8%, and the trustee suggested a rate of 10-11%. The bankruptcy court determined that the rate should be 10.3%, an amount that the district court affirmed as reasonable under the circumstances. The creditor now appeals, insisting that in this case only the contract rate will satisfy the valuation criteria of § 1325(a)(5)(B). We reject this contention as a legal proposition and, giving the bankruptcy court's decision what we believe to be the substantial degree of deference required in this context, we find no error and affirm.

### *FACTUAL AND PROCEDURAL BACKGROUND*

The relevant facts germane to this dispute are not contested by the actual parties to the appeal, Household Automotive Finance and the Chapter 13 Trustee. Indeed, much of the background evidence adduced at the hearings in this matter was introduced by way of joint stipulation. As noted by the bankruptcy court, the parties agreed upon the following facts:

1. Debtors entered into a Retail Installment Contract and Security Agreement dated May 11, 1999 (the "Contract") under the terms of which Debtors purchased a 1996 Chevrolet C1500 Pickup Truck (the "Vehicle") from Myers Chevrolet-Oldsmobile-Cadillac, Inc. (the "Dealer") for an agreed price of $16,827.00.

2. The contract was assigned by the Dealer to Household Automotive Finance Corporation ("Household"), which accepted the assignment.

3. Household has a first and prior lien on the Vehicle by virtue of the Title Lien statement filed in the Perry County Clerk's office on May 20, 1999.

4. Pursuant to the Contract, the balance of the purchase price in the principal amount of $14,767, plus interest at

the rate of 20.95%, was to be paid by Debtors in 60 monthly installments of $399.08.

5.   Debtors made two payments under the Contract before filing their Chapter 13 Petition (the "Petition") on August 16, 1999.

6.  Debtors filed their Plan along with the Petition under which Debtors proposed to pay 8% interest on the allowed secured claim of Household under the Contract.

7.  Household filed its Proof of Claim on September 9, 1999, setting forth a secured claim amount of $14,796.85.

8.  The value of the Vehicle for purposes of confirmation of the Plan is $13,900.

The parties' agreement that the vehicle had a present value of only $13,900 thus resulted in Household having a secured claim against the Kidds in that amount and an unsecured claim in the amount of $867, which represents the difference between the total amount financed and the value of the collateral.   Despite the consensus on the value of the collateral, Household vigorously contested the proposed interest rate to be applied to the payment to the finance company as a secured creditor, arguing that it was entitled to the full 20.95% interest rate rather than the 8% rate proposed by the Kidds.  Given that disagreement, the bankruptcy judge conducted an evidentiary hearing at which three witnesses offered opinions as to the appropriate market rate of interest that should be added to the installment payments for the debtors' truck.

David Clayton Cruise, III, the regional sales manager for Household, explained that Household was considered a "subprime" lender because it offered loans to individuals whose past credit problems or lack of positive credit history made them unattractive customers for banks, credit unions, and other "prime" lenders.  Due to the higher risk of non-payment from those borrowers, Cruise testified, sub-prime

The generally higher rates of interest charged to sub-prime borrowers account for factors which reduce the odds that the debtor will recover the value of the collateral over time.[9] *Memphis Bank* recognizes that the purpose in assessing interest on the secured portion of the claim is to protect the value of the claim from dilution.  To achieve this goal, the element of risk must be factored in more precisely than by simplistically utilizing average interest rates only available to prime borrowers.[10]

Because the majority approves the imposition of cram-down loan interest rates based on prevailing generalized conventional loan rates, rather than loans similar in quality to the coerced loan itself, I must respectfully dissent.

---

[9] *See, In re Glueck*, 223 B.R. 514, 522 (Bankr. S.D. Ohio 1998) ("[A] 'forced loan' of 100% of the value of an automobile is not customary in the industry, and produces additional risks to lenders.") *See also, In re Hardzog*, 901 F.2d 858, 860 (10th Cir. 1990) (listing numerous factors which are utilized by lenders in establishing interest rates).

[10] Other courts considering the issue raised here have also employed a particularized approach which incorporates market-based factors including, *inter alia*, risk, in determining the appropriate cram-down interest rate.  *In re Till*, 301 F.3d 583 (7th Cir. 2002); *In re Smithwick*, 121 F.3d 211 (5th Cir. 1997); *General Motors Acceptance Corp. v. Jones,* 999 F.2d 63 (3d Cir. 1993); *United Carolina Bank v. Hall*, 993 F.2d 1126 (4th Cir. 1993); *In re Hardzog*, 901 F.2d 858 (10th Cir. 1990); *United States v. Arnold*, 878 F.2d 925 (6th Cir. 1989); *In re Glueck*, 223 B.R. 514 (Bankr.S.D.Ohio 1998); *In re Cassell*, 119 B.R. 89 (Bankr.W.D.Va. 1990).

automobile loans in the region, for new and used vehicles. But this average did not include the sub-prime loan market in which the original loan had been obtained.[6]   There was no showing that the debtors had transformed into prime borrowers. Thus the rate applied was, in fact, an unrelated arbitrary rate. The bankruptcy court's addition of 1% to the 9.3% to account for "special circumstances" described as "recent increases in the prime rate of interest"[7] is arbitrariness on top of arbitrariness.

The majority finds refuge for this result in *Memphis Bank's* observation that "[b]ankruptcy courts are generally familiar with the current conventional rates on various types of consumer loans.[8]   The majority converts this dictum into a mandate that only current conventional interest rates can be used for coerced cram-down loans in bankruptcy.

While such uniformity is a bit more convenient, it is at odds with reality.  The time value of money is not in all cases the same. The fact that the lending market reflects a multitude of interest rates at any one moment is a clear demonstration that the market factors the element of risk into the time value of money.  Were it not so, rates for all borrowers would be the same for a given time period, and the availability of credit would be commensurately constrained.

Risk entails many factors.  Among them are the likelihood of repayment as revealed by the financial profile of the borrowers, the nature of the collateral, the size of the equity cushion, and the transaction costs attendant to collection of principal and interest.

---

[6] Joint Appendix, pp. 258, 262-63, 266.

[7] August 14, 2000 Findings of Fact and Conclusions of Law, pg. 3.

[8] 692 F.2d at 431.

lenders generally charged higher rates of interest on their loans, ranging from 20.95% to 24.95% for automobile loans. Cruise did admit, however, that Household's website advertised loans at rates as low as 10.95%. He nevertheless insisted that the Kidds, as a result of their low scores on charts predicting creditworthiness, would not be offered an interest rate by Household less than the contract rate of 20.95%.

The second witness to testify at the evidentiary hearing, Richard Newsome, served as senior vice-president and division manager for consumer lending at Community Trust Bank in the Pikeville, Kentucky, area.  He explained that the bank rate of interest for a high-risk borrower purchasing a 1996 pickup truck would be 16.25% and the average rate  for all used truck loans would be 13.5%.  Pursuant to questioning by the Chapter 13 trustee, however, Newsome indicated that a "weigh[t]ed average" rate for *all* car loans, for both new and used vehicles, and for all tiers of borrowers, would be 9.3% because "99% of those people [in the entire universe of borrowers] pay."

Finally, Michael Litzinger, an attorney in the office of the Chapter 13 trustee, testified that hearings to determine the proper interest rate to be applied in situations similar to the one before the court were seldom required because all parties usually agreed on the application of rates between 10% and 11%. In fact, Litzinger claimed, Household itself had recently agreed to eight different Chapter 13 plans with automobile interest rates of 8% and two plans calling for rates of 10%. The witness concluded that interest rates approved in plans in that area of Kentucky generally ranged from 8-12%. Specifically, he explained:

> Seven percent has almost always drawn objection.  Eight percent will on occasion draw an objection and has done so lately because the interest rate in the market is going up in the last year or so.  Ten and ten and a half don't draw that many objections.   Eleven rarely does and twelve almost never.  Some debtors' accounts have 12

for the sole purpose to make sure that they don't get an objection and it's accepted and I think that's why they do that.

Faced with the divergent testimony of the witnesses at the hearing, the bankruptcy judge found the testimony of Richard Newsome, the bank vice-president, believable and determined that the testimony "that the rate of interest for car loans that are made by his bank in the region is 9.3%, is credible evidence of the market rate of interest." The judge specifically found that Cruise's testimony that the market rate of interest is 20.95% "is not entirely accurate," especially in light of the fact that Household advertises rates on the internet as low as 10.95% and has agreed in other Chapter 13 cases to interest rates of 8% and 10%.

Consequently, the bankruptcy judge found "that the current market rate for similar loans in the region is 9.3%," but that, because interest rates had experienced a recent rise, the rate to be applied to the Kidds' loan should be 10.3%. Both Household and the Kidds appealed that decision to the district court, Household arguing that its contract rate of 20.95% should have been used to arrive at the present value of the collateral, and the Kidds contending that no interest whatsoever should be added to the resale value of the pickup truck. The district judge, however, affirmed the ruling of the bankruptcy court, concluding that the finding of a 10.3% market rate was not clearly erroneous. Additionally, the district court declined to analyze the propriety of the bankruptcy court's consideration of other Chapter 13 plans involving claims by Household, stating that any error in that regard would be harmless because "[t]here is sufficient evidence in the record which supports his conclusion regardless of these agreed orders." Household now appeals from that ruling, availing itself of another opportunity to challenge the conclusion reached by the bankruptcy court.

I believe that the application of a generalized rate of interest, in this instance that of the pool of all prime automobile loans, is both arbitrary and a departure from the clear directive of *Memphis Bank*.

The coerced loan is not made in a vacuum, but rather to an actual debtor/borrower, with a discernable degree of predictable risk both as to default and collection/transaction costs. Because such coerced loans are generally without an "equity cushion," the potential for loss to the creditor/lender is even greater. Since *Memphis Bank* requires that what happens in a cram down be viewed as a coerced loan, the bankruptcy court ought to analyze the kind of loan being made so that interest rates on similar loans can be determined. This, in turn, requires consideration of the amount and duration of the loan, as well as the nature of the collateral and the characteristics of the debtor/borrower.

Such an inquiry is faithful to *Memphis Bank* and likely to put the secured creditor in a position very close to what it would have been in had it been allowed to repossess its collateral. The result is that the coerced loan is not made on unrealistic terms either from the creditor's or the debtor's viewpoint. More importantly, the valuation requirements of 11 U.S.C. § 1325 (a)(5)(B) are respected because neither party has the possibility of an advantage due to the arbitrary imposition of some generalized interest rate.

Because the loan marketplace will take into account prevailing interest rates and risk factors, the bankruptcy court need only determine what market interest rate would be charged, at the time, on such a loan to such a borrower. The contract, if not too old, may provide evidence of how the market would price such a loan.

*Memphis Bank* does not require a loan rate available from the particular creditor to the debtor. Rather, the bankruptcy court ought to determine a market rate bearing some real-world relationship to the coerced loan in issue. Here, the "conventional" rate of interest of 9.3% as determined by the bankruptcy court was based upon an average of all prime

## CONCURRING IN PART, DISSENTING IN PART

SIMPSON, District Judge, concurring in part, and dissenting in part.  I respectfully dissent from the majority opinion to the extent that it interprets *Memphis Bank & Trust Co. v. Whitman*[1] to require reference to "more generally applicable"[2] or "conventional"[3] rates of interest which are unrelated to the particular debtor, when determining the appropriate rate of interest for coerced loans in cram-down situations.

Section 1325(a)(5)(B)(ii) states that a plan shall be confirmed if "the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim."  If the secured claim is to be paid over time, the bankruptcy court must assess interest so that the value of the claim is not diluted through delay in payment.  The secured creditor is forced to extend a new collateralized loan to the debtor, hence the "coerced" loan concept.[4]  *Memphis Bank* mandates that the bankruptcy court determine and apply the current market interest rate for similar loans in the region, not some other unrelated arbitrary rate.[5]

---

[1] 692 F.2d 427 (6th Cir. 1982).

[2] Majority Opinion (Maj. Op.), pg. 11.

[3] Maj. Op., pgs. 11-12.

[4] *See, Memphis Bank*, 692 F.2d at 429 ("In effect the law requires the creditor to make a new loan in the amount of the value of the collateral rather than repossess it, and the creditor is entitled to interest on his loan.")

[5] 692 F.2d at 431.

---

### DISCUSSION

### I.  Standard of Review

As noted in *Borock v. Mathis (In re Clipper International Corp.)*, 154 F.3d 565, 567 (6th Cir. 1998):

> In reviewing district court decisions on bankruptcy matters, this court accords discretion only to "the original bankruptcy court findings, not those included in the decision rendered by the district court, since '[t]his court is "in as good a position to review the bankruptcy court's decision as is the district court."'" *In re Omegas Group, Inc.*, 16 F.3d 1443, 1447 (6th Cir. 1994) (citations omitted).  The court reviews bankruptcy court findings of fact for clear error and conclusions of law *de novo.  Id.*

In the present case, not only do the trustee and Household disagree on the interest rate that may appropriately be charged to the debtors for retention of the collateral at issue, they even disagree on the appropriate standard of review to be utilized by this court in evaluating the bankruptcy judge's determination.  The trustee argues that the court's ruling involves only a factual determination as to which of several competing rates most closely approximates market value.  As a result, she contends that the ruling of the bankruptcy court should be reviewed only under the clear error standard normally reserved for such factual determinations.  *See, e.g., Roach v. United States*, 106 F.3d 720, 723 (6th Cir. 1997)(citing *Anderson v. City of Bessemer*, 470 U.S. 564, 573 (1985)).  Household submits, however, that the issue before the court actually requires selection of the appropriate methodology to be used in making a market rate calculation, and thus entails legal conclusions that are to be reviewed by this court *de novo.  See id.*

Although, at its basic level, the bankruptcy court decision in this case turns upon a finding that one of a variety of potential interest rates should be considered to reflect true "market value," Household is correct that the court is first called upon to establish for the circuit the *methodology* under

which that rate is to be calculated. Consequently, the selection of the appropriate interest rate does indeed involve a legal determination that must be reviewed *de novo* without a presumption of correctness. *See Gen. Motors Acceptance Corp. v. Jones*, 999 F.2d 63, 66 (3d Cir. 1993).

### II. "Cram Down" under Chapter 13

Although the Bankruptcy Code nowhere uses the words "cram down," the term has come to denote the confirmation of a plan over the objection of a secured creditor. Pursuant to the provisions of 11 U.S.C. § 1325(a)(5)(B), a bankruptcy court may approve a plan proposed by a Chapter 13 debtor without the consent of the affected creditor if:

(i) the plan provides that the holder of such claim retain the lien securing such claim; and

(ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim.

In *Memphis Bank & Trust Co.*, 692 F.2d at 429, we recognized that the law, in effect, "requires the creditor to make a new loan in the amount of the value of the collateral rather than repossess it, and the creditor is entitled to interest on his loan." (Footnote omitted.) Such interest payments are mandated simply "[i]n order for the secured creditor to get payments over time under the plan having a present value equal to the allowed amount, as the above quoted statutory language directs." *Gen. Motors Acceptance Corp.*, 999 F.2d at 66.

In reference to determination of the appropriate rate of interest to be added to Chapter 13 payments, we declined to "t[ie] the interest rate to an arbitrary . . . rate," and instead held that:

[I]n the absence of special circumstances bankruptcy courts should use the current market rate of interest used

not *clearly* erroneous in setting a 10.3% interest rate as a "current conventional rate" on consumer automobile loans.[2]

### CONCLUSION

The principles of valuation espoused in the case of *Memphis Bank & Trust Co. v. Whitman* constitute the law of the circuit and are entitled to precedential deference. In order to give effect not only to the plain wording of that decision, but also to the underlying rationale for the ruling and for the applicable provisions of the Bankruptcy Code, we conclude that the proper interest rate to be applied in a Chapter 13 cram down is the current conventional market rate used for similar loans in the region, and not necessarily the contract rate. Such a determination does not entail an analysis of any particular debtor's credit rating but rather involves a more objective determination of the value of money over time so as to compensate a creditor according to the present value of its secured claim.

Moreover, we conclude that the bankruptcy court did not clearly err in arriving at the 10.3% interest rate figure applied to Household's claim. We therefore AFFIRM the judgment of the district court sustaining the decision of the bankruptcy court.

---

[2]The creditor also contends that the bankruptcy court, in settling upon an acceptable interest rate, erroneously considered similar rates to which Household had agreed in other Chapter 13 bankruptcies in the months prior to the Kidds' filing. As stated by the district court in its review of the bankruptcy court ruling, however, this allegation of error need not be addressed on appeal because the other testimony offered at the evidentiary hearing and summarized above was sufficient to support the bankruptcy court's factual determination.

language into its opinion, we elect to give effect to the carefully chosen terms used in the decision.[1]

### III. Analysis of Bankruptcy Court's Factual Determination of Appropriate Rate

Having reviewed *de novo*, and concurred in, the bankruptcy court's decision to examine "conventional" interest rates in setting the appropriate present value of Household's secured claim, we must now apply the more deferential clear error standard in determining whether the bankruptcy judge's selection of a 10.3% interest rate was proper.

At the evidentiary hearing conducted by the bankruptcy court, testimony was offered that even Household, an admitted sub-prime lender with much higher interest rates than could otherwise be obtained, offered loans at rates as low as 10.95%. Even more germane to the bankruptcy court's final determination, however, was the testimony of a local bank officer who surmised that the weighted average of *all* conventional car loans in the area was 9.3%. Finally, evidence was adduced that only occasionally were objections filed to plans calling for 8% interest rates on automobile loans, "[t]en and ten and a half don't draw that many objections[,] [e]leven rarely does and twelve almost never." In light of such information, and considering the fact that no objection was voiced to the finding that interest rates in the relevant vicinity had recently risen, the bankruptcy judge was

---

[1] Similarly, had the *Memphis Bank & Trust* court desired to mandate use of an interest rate that would approximate the rate for which the lender would contract, it could easily have used the term "contract rate" in delineating the analysis to be undertaken. Or, as some courts have done, it could have created a presumption in favor of the contract rate as the coerced loan rate. *See, e.g.*, *General Motors Acceptance Corp.*, 999 F.2d at 67-68.

for similar loans in the region. Bankruptcy courts are generally familiar with the current conventional rates on various types of consumer loans. And where parties dispute the question, proof can easily be adduced.

*Memphis Bank & Trust*, 692 F.2d at 431. Even after such a seemingly clear explanation by this court of the proper method for calculating interest in cram down situations, Household now cites additional Sixth Circuit decisions in an attempt to justify its effort to maximize debtor payments to itself to the detriment of other creditors.

For example, the finance company discusses in its brief on appeal the holding in *Cardinal Federal Savings & Loan Ass'n v. Colegrove (In re Colegrove)*, 771 F.2d 119 (6th Cir. 1985). In *Colegrove*, a case arising "in the context of home mortgage arrearages," KEITH M. LUNDIN, CHAPTER 13 BANKRUPTCY § 112.1, at 112-2 (3d ed. 2000), the court concluded:

> [T]he most equitable rate to establish in this type of situation is the prevailing market rate of interest on similar types of secured loans at the time of allowance of the creditors['] claim and the confirmation of the plan in bankruptcy with a *maximum limitation* on such rate to be the underlying contract rate of interest.

*Colegrove*, 771 F.2d at 123 (emphasis in original). Household focuses upon that language to support its position that the appropriate interest rates for the automobile transaction in this case should also be determined by reference to "the underlying contract rate of interest." We have, however, limited *Colegrove* to its particular facts -- a home mortgage arrearage situation in which the creditor "was completely secured and was not required to accept unsecured status as to any portion of its debt." *United States v. Arnold*, 878 F.2d 925 (6th Cir. 1989). Because the factual situation in this appeal in no way resembles the facts of *Colegrove*, we conclude that the decision in that case is inapplicable here.

Household also cites the *Arnold* decision in support of its argument that *Memphis Bank & Trust*'s references to "the

current market rate of interest used for similar loans in the region" and "the current conventional rates on various types of consumer loans" actually relate only to a lender's own interest rate and not an actual "market" or "conventional" rate. In *Arnold*, we resolved a dispute involving a Chapter 12, rather than a Chapter 13, bankruptcy, but we noted that Chapter 12's cram down provision "is identical to that found in Chapter 13." *Arnold*, 878 F.2d at 927. Then, in determining which of competing interest rates to apply, we held "that where a 'cramdown' occurs . . . and a creditor is forced to write-down a portion of its note, a creditor is entitled to receive *its* current market rate on the 'new loan.'" *Id.* at 930 (footnote omitted) (emphasis added). Household contends that this court's use of the word "its" in describing the relevant market rate indicates that a more general rate need not be considered and that the interest rate at which the particular creditor would loan money to the particular debtor may be used for cram down purposes.

There is, however, absolutely no indication in *Arnold* or in other Sixth Circuit decisions that use of the phrase "its market rate" mandates assessment in this case of interest at the rate at which a loan would be made by Household to borrowers identical to the Kidds in all relevant respects. In fact, adoption of such a rate is tantamount to endorsement of the automatic application of a contract rate of interest, a principle clearly at odds with the clear language of *Memphis Bank & Trust*. Rather, it is more likely that use by the panel in *Arnold* of the modifier "its" to describe the appropriate market rate was intended solely to limit consideration to rates relevant to the particular *types of loans* at issue. For instance, the setting of the market rate for automobile loans should be limited to consideration of only the automobile loan universe and not rates that would apply to an average borrower seeking, for instance, financing for a new home.

Furthermore, as noted by the bankruptcy court in *In re Richards*, 243 B.R. 15, 22 (Bankr. N.D. Ohio 1999), the purpose of Chapter 13's cram down provisions is to ensure "that a secured creditor . . . receive[s] payment equal to the

value of the collateral as of the effective date of the plan." To the extent that the debtor's payments are spread out over time, "the creditor will actually receive less than what he is entitled to due to the simple fact that a sum of money received over [time] does not have the same value as a sum of money received today." *Id.* Hence, in *Memphis Bank & Trust*, we concluded "that current market rates of interest would best approximate the present value of a secured claim." *Id.* Thus, payment of that amount and that amount alone satisfies the purposes of the cram down provisions. In fact, "[t]o permit a secured creditor to receive interest on his claim in an amount greater than the conventional market rates would allow the creditor to actually receive more than the allowed amount of his secured claim." *Id.*

Finally, an analysis of the language used in *Memphis Bank & Trust* clearly negates application of an interest rate that can be determined only on a case-by-case basis through analysis of information provided and controlled by the creditor. Clearly, the opinion does not anticipate imposition of a rate of interest that would apply in the non-existent "market" that encompasses the factors prevalent in the bankruptcy setting. Rather, by stating that "[b]ankruptcy courts are generally familiar with the current *conventional rates* on various types of consumer loans," *Memphis Bank & Trust*, 692 F.2d at 431 (emphasis added), we directed the use of more generally applicable rates. Moreover, had loan-specific rates been contemplated in formulating the proper interest calculus, there would have been no need to refer to "conventional rates." Indeed, adoption of the position espoused by Household in this appeal would virtually ensure that bankruptcy courts would *not* be familiar with the rates charged by various lenders to different borrowers based upon varied elements of a personal credit history. Rather than conclude that the *Memphis Bank & Trust* court inserted wholly superfluous